# BROTHERHOOD OF LOCOMOTIVE FIREMEN AND ENGINEERS

## *vs.*

## CORA NASH.

*Life Insurance—Evidence of Death—Identification of Body— Presumption from Seven Years' Absence—Proofs of Loss—Waiver—Instructions—Evidence.*

In an action on a death benefit certificate issued on the life of plaintiff's husband, the testimony of plaintiff and her sister as to their identification of a body, buried in the potter's field and afterwards exhumed in their presence when in an advanced state of decomposition, as being the body of plaintiff's husband, who had disappeared, *held* to be sufficient to go to the jury as establishing the fact of the husband's death.

pp. 631-635

Evidence that the officers of the local lodge of defendant society expressed to plaintiff their disbelief that a certain body buried in the potter's field was that of her husband, that they refused her request that they exhume the body for examination, that they suggested to her that if her husband was not heard from within seven years from the time of his disappearance he would be presumed dead and the insurance would be recoverable, that she consequently deferred action in the matter and got the local lodge to pay her husband's dues in order that he might be kept in good standing, *held* to be sufficient to go to the jury as showing a waiver of the further proof of death required by defendant's constitution and by-laws, or as showing an estoppel of defendant in this regard. pp. 633-635

In an action on a death benefit certificate issued by defendant society, *held* that, upon the facts of the case, it was a question for the jury whether there was a final rejection of the claim, and if there was such rejection, when it occurred, for the purpose of a requirement in defendant's constitution that suit should be brought on a claim within six months after its final rejection. pp. 635, 636

An act may be relied on as a waiver of proofs of death even though it did not occur within the time named in the contract of insurance for the filing of such proofs. p. 636

In an action on a contract of life insurance which was based on a claim that a certain body was that of insured, and in which a witness testified that he saw insured a year after the burial of the body in question, it was proper to instruct the jury that if insured was seen by such witness, plaintiff was not entitled to recover, the question of fact thus segregated being a central and controlling one, the existence of which was sufficient to warrant a verdict for defendant, without consideration of other facts in the case. pp. 636-638

The presumption created by absence of a party unheard of for the period of seven years is not of his death within that period, but of his death immediately upon the expiration thereof, and, consequently, there could be no recovery of insurance on one's life by reason of his absence for a period less than seven years previous to the bringing of the suit, even though he was absent and unheard of for seven years previous to the time of trial. ' . pp. 638, 639

In an action against a beneficial society on a death benefit certificate, conversations between plaintiff and the chairman of the local lodge *held* admissible by reason of the relation which such chairman bore to the grand lodge, and the duty which he owed to plaintiff in connection therewith, to co-operate with plaintiff in furnishing proof of the death of insured in accordance with the requirements of the constitution and rules of the society. p. 640

It was error to allow a witness to state the reason which actuated another in making certain statements to such witness and to speculate as to his purpose. p. 640

That the court, while deciding that an amendment to the declaration was essential to the admission of certain evidence offered by plaintiff, did not require the amendment to be actually filed before admitting such evidence, was not prejudicial to defendant, the amended declaration being filed within the time permitted by the statute. pp. 640, 641

The defendant was not prejudiced by the court's refusal to suspend the proceedings in order that it might file a special plea to an amended declaration, it being permitted to introduce under its general issue plea all evidence which it could have introduced under a special plea. pp. 640, 641

The trial court is not justified in ordering a witness to leave the stand because of an attorney's repetition of a question already ruled to be inadmissible, unless it appears that the attorney is knowingly acting in violation of the court's ruling, and then only after he has been warned that such action will be taken if he continues to ask such questions. p. 643

It was proper to refuse to allow a witness to state the contents of the records of the city morgue as to a certain body, the record itself being the best evidence of its contents. p. 643

A statement in the declaration in a suit on a death benefit certificate, that the plaintiff "has complied with all the requirements of the insurance contract except those provisions that were waived by the defendant or which the defendant is estopped to rely upon," was too indefinite as an allegation of general performance. p. 643

*Decided January 8th, 1924.*

Appeal from the Court of Common Pleas of Baltimore City (DUFFY, J.).

Action by Cora Nash against the Brotherhood of Locomotive Firemen and Engineers, a corporation. From a judgment for plaintiff, defendant appeals. Reversed.

The cause was argued before BOYD, C. J., THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Albert J. Fleischmann,* with whom was *H. Mortimer Kremer* on the brief, for the appellant.

*Hilary W. Gans* and *S. Ralph Warnken,* for the appellee.

PATTISON, J., delivered the opinion of the Court.

Frank Nash, the husband of Cora Nash, the appellee, was the holder of a beneficiary certificate issued to him by the Brotherhood of Locomotive Firemen and Enginemen, by which his wife, the beneficiary named in the certificate, in the event of his death, was to receive from the beneficiary fund of the brotherhood the sum of fifteen hundred dollars, upon proof of his death being furnished as required by the constitution, rules or regulations of the brotherhood.

At the time of the issuance of the certificate, Nash was employed by a railroad company and resided at Brunswick, Md., but his services were thereafter dispensed with by the company because of his excessive use of intoxicants.

After his discharge by the railroad company, he continued to reside at Brunswick with his family, consisting of his wife and three children, doing contract work between Cumberland and Brunswick. This work he continued to do until about a week prior to August 7th, 1913, when he returned to his home and there remained until the day last named, when he left home to seek employment.

It is not shown by the record that Nash said where he was going in search of work, though his wife, as she says, was of the impression he was going to Baltimore. He on previous occasions had left his home and found work elsewhere, but on those occasions, as stated by his wife, he occasionally wrote to her and returned to his home at or around Christmas.

After leaving on August 7th, 1913, she heard nothing from him and, becoming anxious, she instituted search for him. In her efforts to find him she went to Baltimore and while there she visited the morgue, where she examined the records, and found a description of one who had been taken from the harbor in September, 1913, the month following the departure of Nash from his home at Brunswick, and from the description given she was inclined to believe that it was the body of her husband.

The body referred to had been buried in the potter's field and, as she stated, she applied to one or more of the officers

of the local branch of the brotherhood to have it disinterred in order that it might be ascertained whether it was the remains of her husband, but failing in her efforts to have them do so, she, on the 7th day of July, 1914, had the body exhumed. It was at that time in an advanced stage of decomposition, but Mrs. Nash, as well as her sister, who had accompanied her to the potter's field, testified that the body they there saw was that of Frank Nash. After its reburial, Mrs. Nash again saw certain of the officers of the local branch of the brotherhood and asked them to have the body again taken up that it might be shown to be that of her husband. This the officers refused or failed to do.

It is evident that they had no confidence in the claim of Mrs. Nash that the body she had exhumed was that of her husband, especially in view of the statement of a conductor upon the railroad, who knew Nash well and who had worked upon the road with him, that, on or about Christmas of 1913, after the burial of the party mentioned, he had seen Nash upon his train, and had spoken to him, calling him by name, and Nash had returned his salutation.

The officers of the brotherhood, whom she approached on the subject, expressed to her their non-belief in her claim that the body she had seen was the remains of her husband; and it seems that she then determined not to push the matter further at that time, but to wait the lapse of seven years, when, as she says, she was told by them, her husband would be presumed to be dead, if not heard from in the meantime; and it was pursuant to such determination that she thereafter made application to the local organization to pay her husband's dues to the brotherhood, that he might be kept in good standing during such waiting period. This the brotherhood did for several years, until May, 1917, when she was informed by an officer of the brotherhood that the dues would not be longer paid by it, saying in addition thereto that by the constitution and by-laws of the brotherhood his disappearance for seven years without having been heard from would

not entitle her to receive the amount named in the certificate, unless his death was otherwise shown by "positive" evidence.

On the 10th day of September, 1918, Cora Nash, the appellee, brought suit in this case to recover said amount.

A demurrer was sustained not only to the first *nar.* filed, but also to the first and second amended declarations. The case however went to trial, in November, 1920, on the third amended declaration, and a verdict was rendered thereon for the plaintiff for the sum of fifteen hundred dollars, but upon motion of the defendant a new trial was granted.

The case again proceeded to trial on May 31st, 1921, that trial resulted in a verdict for the defendant, and again a motion for new trial was filed and granted. In the third trial a verdict was rendered on the 20th day of September, 1922, for the plaintiff for the sum of twenty two hundred and twenty dollars; and, although a motion was filed, a new trial was not granted, and judgment was entered upon the verdict. It is from that judgment this appeal was taken.

In the progress of the trial thirty exceptions were taken, twenty eight to the court's rulings on the evidence, one upon the prayers and one to the action of the court in its refusal to instruct the jury to disregard a statement made to the jury by plaintiff's counsel in his closing argument.

The declaration upon which the case was tried the first and second times, and the one upon which the third trial proceeded to the conclusion of the plaintiff's evidence, when amended by the filing of an additional count, consisted of three counts.

The first, "for money received by the defendant for the use of the plaintiff as set forth in the beneficiary certificate * * * issued by the defendant to the plaintiff"; the second, "for money found due from the defendant to the plaintiff on accounts stated between them as set forth in" said certificate; and the third, a special count, in which the certificate is set out in full and which contains the allegation that "Frank

Nash died sometime prior to July 8th, 1914. That on July 8th, 1914, the beneficiary, Cora Nash, plaintiff herein, acquired knowledge of the fact of the death of said member, and that proof of death was made within sixty days from the time the beneficiary acquired knowledge of the fact of the death of said member; and that demand was made upon the officers of the defendant organization for payment of the amount due under said beneficiary certificate, but payment was refused." To each of these counts the defendant pleaded "never indebted" and "never promised," as alleged, and limitations, alleging therein that the cause of action did not accrue within three years before the institution of the suit. On the first and second pleas the defendant joined issue, and demurred to the third, which demurrer was sustained.

The fourth count, which was added at the conclusion of the plaintiff's evidence, after again setting out the certificate in full, alleged that "Frank Nash died sometime prior to July 8th, 1914. That on July 8th, 1914, the beneficiary, Cora Nash, plaintiff herein, acquired knowledge of the fact of the death of said member and that notice of the identification of said Frank Nash was given to the defendant by the plaintiff on or about July 8th, 1914, which was within sixty days from the time the beneficiary acquired knowledge of the fact of the death of said Frank Nash and the defendant waived the filing of further proof of death of said Frank Nash, and although demand has been made upon the defendant for payment of the amount due under said beneficiary certificate, payment thereof has been refused."

A demurrer to this count was filed and overruled, whereupon the general issue plea was filed. It was upon the pleadings stated that the judgment appealed from was obtained.

The plaintiff offered five prayers, of these, only the 5th prayer, upon the measure of damages, was granted.

The defendant offered seventeen prayers, the 1st, 2nd, 3rd, 4th, 5th, 9th, 10th, 11th, 12th, 13th, 14th, 15th and 17th of which were refused while the 6th, 7th, 8th and 16th were granted.

The first five prayers asked for a directed verdict against the plaintiff upon the following grounds: the second for want of evidence legally sufficient; the first for the want of evidence legally sufficient under the pleadings; the third for want of evidence legally sufficient to show "that the plaintiff furnished to the defendant satisfactory proof of the death of her husband, Frank Nash, within sixty days after she acquired knowledge of the fact of said death, or that the defendant, acting through some officer with authority to do so, waived the filing of satisfactory proof of death." The fourth was for causes, in effect, much the same as those mentioned in the third prayer; and the fifth, for want of evidence legally sufficient "to show that the suit was commenced within six months from the final rejection of the plaintiff's claim by the defendant, as required by the benefit certificate, constitution, rules and regulations of" defendant.

In passing upon these prayers, it will be necessary to set out, to some extent, certain provisions of the certificate, constitution and rules of the brotherhood, and to state quite fully the evidence found in the record.

It is stated in the certificate, as well as in the constitution, that "all rights of action by the beneficiary upon this certificate shall be absolutely barred unless proof of death, as required by said constitution, shall be made within sixty days from the time that said beneficiary has acquired knowledge of the fact of the death of said member, and * * * any action under this certificate * * * by * * * the beneficiary designated herein shall be absolutely barred unless such action shall be commenced in some court of competent jurisdiction, within six months from the final rejection of the claim."

The procedure to be followed in the event of the death of one of the members of the brotherhood and the meaning of "proof of death" when applied in such cases, may be gathered from section 75 of the Constitution of 1907, where it is stated:

"Upon the death of a beneficiary member in good standing, it shall be the duty of the secretary of the

lodge, of which the deceased was a member, to im-
mediately make a statement thereof under the seal of
the (local) lodge.  There shall also be issued a sworn
statement and a certificate of death by a coroner or by
the attending physician, which shall state the date of
the injury and cause of death.  The collector shall
issue a statement under seal of the lodge certifying to
the good standing of the member at the time of his
death.  Affidavits of at least two reputable witnesses
shall be filed with the grand secretary and treasurer,
which prove the death of the member.  If a physician
was in attendance at his death his affidavit shall be
filed, or if a coroner held an inquest upon his remains,
his affidavit shall be filed.  At least one sworn proof of
death shall positively identify the deceased as being
the member of the brotherhood whose death claim is
filed.  The secretary shall forward these statements, to-
gether with the beneficiary certificate of the deceased,
to the grand secretary and treasurer, who shall adjust
the claim, if the same is found to be valid."

As already said, Frank Nash, the husband of the plaintiff,
left his home in Brunswick, Md., on August 7th, 1913, to seek
employment elsewhere, and at that time, so far as the record
discloses, he was a member of the brotherhood in good stand-
ing.  His wife never heard from him thereafter, nor did she
know where he had gone.  In her search for him, she went to
Baltimore City and, as we have said, went to the morgue to
ascertain whether his remains had been brought there.  In
the examination of the records there she found a description
of one whose age was given therein at thirty-five years, and
although her husband was much older, she nevertheless
thought from the description that it was possibly her hus-
band; and, after requesting certain officers of the local lodge
to disinter the body, which was buried in the potter's field,
and after their refusal or failure to do so, she had it exhumed.
The body was taken from the grave under the direction or

supervision of the officials of the morgue and, upon the arrival of the plaintiff, with her sister and Mr. Woodall, the superintendent of the morgue, at the place of its burial, the body was in a box where it could be seen by them.

Upon looking at the body, the plaintiff exclaimed, "My God, that is him." In describing the body she said: "It was in a good condition to be buried as long as it was," and when asked, "Was all the flesh on the face so that you could recognize the person?" she answered, "The flesh was there, but was drawn and brown like a cocoanut, but the hair on the head was mud. It was mud from the top of the head to the waist, but from here (indicating) down there was no mud at all. And the shoes were laboring shoes, like a laboring man wears, and the size of his shoes and the bunion on his feet, the hair was all full of mud except one place up here and that was just the same as if there was no mud on the head at all." And this she said was "black with grey mixed." It appears that those who had removed the body from the grave had, in handling it, brushed off his mustache, and it, or a great part of it, was lying on the "floor" of the box. This, Mrs. Nash said, was red like that of her husband.

She also testified that the teeth of the remains, like those of Mr. Nash, were decayed, and that the shoes upon the feet had enlargements on the inner side, indicating that the wearer of them had bunions. This, it seems, was the chief reason for her believing that the remains were those of her husband, as he had bunions, although she does not seem to have identified the shoes or clothes as those worn by Nash.

Upon cross-examination she stated that the face of the remains, viewed by her, "was not recognizable; it was drawn, the skin was brown."

Mrs. Alloway, the sister of the plaintiff, testified that Mrs. Nash lived in Baltimore before going to Brunswick to live. She, at that time, knew Nash, who was boarding with her sister. Mrs. Nash's former husband was then living with her. She saw Nash quite frequently while at her sister's in Balti-

more, but saw little of him after they moved to Brunswick. She knew him well enough, she said, to have recognized him had she met him on the street. She went to the potter's field with her sister and Mr. Woodall; upon their arrival there she found the "grave was opened and the body sitting in a box outside of the grave." And she said she identified the body in the box as that of Frank Nash.

She was asked if the flesh was on the face, she answered "not on the face, on the hands, on the face it seems the flesh was dried away, the skin was there so that the skin was drawn right tight, like over a skeleton. Q. Was it possible by looking at his face to just identify him by his face alone? A. Not by his face alone, altogether, but with the general appearance. Q. What peculiar things were you able to see then, about that body, which you knew Mr. Nash had? A. Well the very prominent bunions and the sort of V-shape that was worn in his teeth and then, seems that the mustache, the part that was there, and when it was touched, it fell—resembled the appearance of his mustache." The V-worn shape place in the teeth she attributed to his use of the pipe, which, she says, Nash so generally smoked. She also spoke of his hair and tatoo marks, all of which was very indefinite. She had not seen Nash for eight or ten years.

Mrs. Nash also testified that, after viewing the body at the potter's field, which she believed to be the body of her husband, she went to Mr. Tony C. Stahlman, who was at that time, and has ever since been, the financial secretary of the local lodge of the defendant brotherhood. Mr. Stahlman was not at home and thus she failed to see him. She then went to see David May, chairman of the local lodge, and told him about the body she had taken up, which she thought was her husband, giving her reasons for so thinking, and asked that the lodge disinter the body that it might be shown whether it was the remains of her husband. This she did with the view of applying for the insurance. It was with Mr. May that she chiefly discussed the question of again exhuming the body

and the further question of the presumption of death after the lapse of seven years. In her conversations with him, she was told by him, she says, though denied by Mr. May, that "it was the law if a person was missing, that the insurance would be paid within seven years."

Her sister, Mrs. Alloway, also testified that, after viewing the remains in the potter's field, she, at the request of her sister, saw Mr. Pennell, recording secretary of the local lodge, and asked him what the lodge was going to do about disinterring the body Mrs. Nash had exhumed, and she was told by him that they could not do anything. Mrs. Nash also had a conversation with Mr. Pennell in March, 1918, before bringing suit on the 10th day of September, 1918, in which he said, "if it wasn't proved, Mr. Nash was dead I could keep them (the dues) up for ever and I would never get nothing."

It was because of the action of the officers of the local lodge in refusing to act upon her request to exhume the body; their belief expressed to her that the body exhumed was not that of her husband; and the suggestion that he, if not heard from within seven years from the time of his disappearance, would be presumed dead, and that at such time the insurance would be recoverable, that she deferred further action in the matter and, as a result of such determination, she applied to and had the local lodge pay her husband's dues that he might be kept in good standing.

Pennell, in speaking of the procedure, in the event of the death of one of the members of the lodge, to recover the insurance upon his life, testified that "when we hear of a death the first thing is the financial secretary gets in touch with where this occurred and who it is, and also our president would take action in any case of mishaps, accidents or death, and then it is reported back, and as I told you, the papers will come to the recording secretary and we will write for the papers to file these disabilities." That when they heard of a death they would write to the general recording secretary and treasurer of the grand lodge, at Cleveland, Ohio, to send

blanks to be filled out. He was asked, "Let me see if I understand you? If you hear of a death or a death is reported to your lodge, then you send somebody to view the remains, is that what you say? A. The president. Q. He send somebody to view the remains? A. To view the remains. Q. How do these notifications usually come to the lodge? A. Well, they come in various ways, we will get it by letter, we will get it by person, any person who hears of it makes this request to the lodge, and they are in duty bound to get after and ascertain the whereabouts and the trouble."

The evidence we have so fully stated, was, we think, legally sufficient to go to the jury, as tending to establish the death of Nash in 1913; and the acts and conduct of the officers of the local lodge, who were to co-operate with the plaintiff in furnishing proof of his death, were legally sufficient, as tending to show a waiver of all further proof of death in conformity with the constitution, by-laws and regulations of the brotherhood within the time therein limited; or, if not showing a waiver as stated, such acts and conduct of said officers tended to show an estoppel, by which the defendant was prevented from requiring the plaintiff to furnish further proof of Nash's death, which she could only do with the aid and co-operation of the officers of the local lodge.

The question, however, as to the sufficiency of the evidence upon which to find that the body exhumed by the plaintiff was the remains of Nash, or whether there was evidence sufficient to find a waiver of proof of death in accordance with the requirements of the certificate, constitution and rules of the brotherhood, are not for us to decide, and we are not to be understood as so passing upon them. These questions were for the decision of the jury.

The fifth prayer, as we have said, asked that the case be withdrawn from the jury, for the want of evidence legally sufficient to show that the suit was commenced within six months from the final rejection by the defendant of the plaintiff's claim.

If the necessity for so doing was not waived and the question was properly before the jury under the pleadings, it, upon the facts of the case, was one for the jury to decide, whether there was a final rejection of her claim and when it was so rejected, if they find such rejection.

The defendant's first, second, third and fifth prayers were, in our opinion, all properly rejected, for the reasons we have stated.

The defendant's sixth, seventh, eighth and sixteenth prayers, as we have said, were granted.

The court, we think, in its refusal to grant the defendant's ninth prayer, committed no reversible error.

Its tenth prayer asked the court to instruct the jury that "unless they find the act relied on as a waiver of filing of such proofs of death happened or occurred within sixty days from the time the plaintiff acquired knowledge of the fact of the death of the insured, Frank Nash," the plaintiff was not entitled to recover. The court's refusal to grant this prayer was proper under the decisions of this Court in *Rokes* v. *Amazon Ins. Co.,* 51 Md. 512; *Federal Mut. Fire Ins. Co.* v. *Julien,* 144 Md. 380.

The eleventh prayer of the defendant's was properly rejected for the reasons assigned in the discussion of its first four prayers.

The defendant's twelfth prayer, we think, should have been granted. By it, the court was asked to instruct the jury "that if they shall believe from the evidence that Frank Nash, the insured, was seen during December, 1914, by John W. Tucker, as testified by him, then the plaintiff is not entitled to recover in this action, and the verdict of the jury must be for the defendant."

John W. Tucker, a conductor on the Baltimore and Ohio Railroad, who was produced as witness by the defendant, testified that he knew Nash very well, they had worked together upon the road; that around the Christmas holidays of 1914, after he had heard that a body buried in the potter's

field had been exhumed in the previous summer and identified by Mrs. Nash as her husband, Nash boarded his train, a local between Cumberland and Baltimore, and as he says: "After we left the station, I went back in the train and commenced taking up my tickets and I seen that fellow sitting there and I looked at him, and I looked at him the second time, and I said to myself, 'that is Nash,' and when I got back to Nash, Nash handed me his ticket and I looked at him and I said, 'Hello, Nash,' and he said 'How are you,' and he pulled his cap down over his face, and that is the last he said to me and that is the last I said to him, because that was a pretty busy job and I had no time to talk with anybody."

The claim of the plaintiff is that the body she viewed at the potter's field was that of her husband. It was shown by the evidence that the body was brought to the morgue on the 7th day of September, 1913, and it was in a short time thereafter buried in the potter's field. It is upon the identity of said body as that of her husband that she, in this suit, in our opinion, must rely in her efforts to recover the insurance mentioned in the certificate.

It is true the prayer segregates one question of fact from the evidence produced, and the jury are told by it that if they believe such fact exists their verdict must be for the defendant. We do not think, however, that the prayer is bad for such segregation. If the man that Tucker saw upon his train was Nash, then the body of the man who had died and was buried more than a year prior thereto, and who was thereafter exhumed and viewed by the plaintiff, could not have been the body of Nash. Nash could not have been dead in September, 1913, the time when said body was taken to the morgue, and alive in December, 1914, when seen by Tucker; and the prayer which asked that the jury be told, in effect, that if they should believe that Frank Nash was seen alive by Tucker, as stated, in December, 1914, more than a year after the death of the man who was thought and claimed by the plaintiff to be Nash, her husband, then their verdict must be for the defendant, should have been granted.

The fact submitted to their finding in this prayer was a central and controlling one and, if the jury believed it existed, it was sufficient to warrant the rendition of a verdict for the defendant, without consideration of other facts in the case. *Union R. R. Co. et al.* v. *Steever,* 72 Md. 159; *Kaufman Beef Co.* v. *United Rys. Co.,* 135 Md. 524.

The court, we find, committed no reversible error in its refusal to grant the defendant's thirteenth prayer, or in its rejection of its fourteenth, in view of its other granted prayers.

The fifteenth prayer, we think, was properly refused, if for no other reason, because it ignores all evidence as to liability except that of the mere disappearance of Frank Nash, which may have been misleading to the jury, and the same may be said of its seventeenth prayer.

Before passing upon the exceptions to the evidence, we will first consider the exception to the action of the court in its refusal to instruct the jury to disregard the statements made by the counsel of the plaintiff in his closing argument, in which he told the jury that "even if you believe that the body claimed to have been that of Nash, was not in fact the body of Nash, you must nevertheless bring in a verdict for the plaintiff, if you believe from the evidence that Frank Nash, the insured, has been absent and unheard of for a period of more than seven years."

In effect, the jury were told that they could render a verdict for the plaintiff in this action, if they believed from the evidence that Frank Nash had been absent and unheard of for a period of seven years, notwithstanding they did not believe that the body, which was claimed to be that of Nash, was the body of Nash. In other words, they were told that they could render a verdict for the plaintiff if they believed from the evidence that Nash had been absent and unheard of for the period mentioned, without regard to the claim that said body was Nash's body. This was not, we think, properly stating the law of the case. By the law of this State the pre-

sumption created by the absence of the party unheard of for the period of seven years is not that he died within that period, but immediately upon the expiration of it. *Tilly* v. *Tilly,* 2 Bland, 444; *Shriver* v. *State,* 65 Md. 286; *Schaub* v. *Griffin,* 84 Md. 563.

Therefore, relying alone upon the presumption, Nash's death could not have occurred earlier than the expiration of seven years from the time that he left his home, which was on August 7th, 1913, and though this time had been reached by the time of the trial of the case, only about five years had passed since his disappearance at the time of the institution of the suit, at which time, he, under the presumption, could not have been regarded as dead, and if he were not dead at that time, the suit was prematurely brought and no recovery could have been had thereunder.

The constitution of the defendant contains the provision that "no liability, arising from the disappearance of a member or the presumption of death of a member arising from any such disappearance, should be incurred by the brotherhood. The said brotherhood shall only be liable for the payment of a death claim when there is positive proof of the actual death of a beneficiary member," but the validity of this provision, which is assailed by the plaintiff, need not be passed upon, in view of the position taken by us in relation to the rights of the plaintiff to recover in this suit upon the presumption arising from the absence of Nash.

There is in this case a record of two hundred printed pages, consisting largely of colloquies between counsel and between court and counsel, much of which, we think, might well have been omitted from the record, without impairing the proper presentation of the case to this Court.

The first exception is to the question asked Mrs. Nash why she decided to have the body in the potter's field taken up. To this question we discover no serious objection, but if it were otherwise regarded, the answer thereto renders it harmless to the defendant.

The second exception is to the admission in evidence of a photograph of Nash taken some years before his disappearance. Under some circumstances it might have been useful in the identification of the body exhumed. But upon the facts of this case we fail to see how its admission could serve any useful and proper purpose.

The third, fifth, sixth, seventh, eighth, ninth and tenth exceptions relate to conversations had between the plaintiff and May, chairman of the local lodge. These conversations were, we think, binding upon the grand lodge and therefore admissible—though otherwise claimed by the defendant—because of the relation May, as chairman of the local lodge, bore to the grand lodge, and the duty he owed the plaintiff, in connection therewith, to co-operate with her in furnishing proof of the death of Nash in accordance with the requirements of the constitution and rules of the brotherhood.

In the fourth exception the plaintiff was permitted to state May's reason in saying what he did to her and to speculate as to what was his purpose. This, we think, should not have been allowed.

The evidence admitted under the eleventh exception should not have been admitted. It was purely hearsay evidence, but as it was subsequently stricken out, no harm was done the plaintiff by its admission at such time.

The twelfth exception was to the action of the court in not requiring the plaintiff to actually amend her declaration at the time when it was held by the court to be essential, in order to admit evidence of the defendant's denial of liability and its reasons given therefor, which was produced by the plaintiff in support of her claim that the defendant thereby waived proof of Nash's death in accordance with the constitution and rules of the brotherhood; and in permitting her for the time being to proceed with the production of her evidence without the amendment being actually filed.

The fourteenth exception was to the court's refusal to suspend proceedings and permit the defendant's counsel to

file a special plea to the amended declaration, which at that time had been filed, he being told by the court to file his general issue plea short and that under such plea he would be permitted to produce any evidence that would be admissible under a special plea. Thereafter he demurred to the amended declaration, which was overruled and then, under protest, filed the general issue plea. Under it, he was permitted to introduce, without objection, any and all evidence that he could have introduced under a special plea.

While the amended declaration was not filed at the time it was held to be essential in order to produce the evidence referred to, offered by the plaintiff, it was filed within the time permitted by the statute and before the defendant was required to proceed with the taking of his evidence, and thus we are unable to discover in what way the defendant was injured by the court's action in not requiring the amendment to be made at the time the defendant claimed it should have been made; nor do we see how the defendant was harmed because of the court's refusal to suspend the proceeding and permit it to file a special plea, if such was essential and proper in the case, as it was permitted to introduce and did introduce, without objection, the same evidence under the general issue plea that it would have been permitted to do under a special plea.

The thirteenth, twenty-third, twenty-fourth and twenty-fifth exceptions were to the ruling of the court in permitting witnesses, who had accompanied Mrs. Nash and her sister to the potters' field, where they had viewed the body, to say that Mrs. Nash and her sister recognized him as Mr. Nash. If this evidence was wrongfully admitted, it was not a reversible error, as both Mrs. Nash and her sister had testified that they did at such time recognize the body as that of Mr. Nash.

The fifteenth, sixteenth, seventeenth and eighteenth exceptions involve the question of authority in May, as chairman of the local lodge, to waive for the defendant the proof of death of Nash, in accordance with the constitution and rules

of the brotherhood.　The ruling upon these exceptions, we think, were proper for the reasons already stated; and we discover no reversible error in the court's rulings upon the nineteenth and twentieth exceptions.

In the twenty-first exception, the witness, an official of the morgue, was asked upon cross-examination what his duties were.　He had previously stated very fully what his duties were and the question was ruled out.　The counsel for the defendant then asked, "Kindly tell what your duties are and what your regular course is———"　The court interrupting him said, "He has answered the question; of course, I rule that out."　The counsel for the defendant then said, "I just want to narrow it down———" when the court again interposed, saying "You want to do something against the rules of evidence and that is the reason why I don't allow you to do it."　The counsel for the defendant then started to propound a question, saying "among your duties at the morgue———" when the court interposed again by saying, "Here, come on, step down, Mr. Witness," to which the counsel for the defendant replied, "I haven't finished with this witness," and the court said, "Well, I have finished with him."　The counsel then said "If your Honor wants to try the case I can't try it."　It was to this action of the court in ordering the witness from the stand that the twenty-first exception was taken.

Thereafter the court said, "You have got to try it (the case) according to the rules of evidence," and the defendant's counsel, answering, said, "I am going to try it in my own manner."　The court then said, "Oh, no, you are going to try it in my manner, just bear in mind; you must try the case according to the rules of evidence."　Whereupon the counsel excepted "to the attitude of the court before the jury."　This forms the twenty-second exception.

As stated, the witness had already said, in his examination in chief, what his duties were and, when again asked on cross-examination what they were, the court ruled out the

question.   The question had been once asked and answered and there was no occasion for the question again being asked, and thus the court was right in ruling it out.   The counsel for the defendant persisted in asking the same or a like question and the court said what it did, and ordered the witness from the stand.   An attorney, of course, has the right to continue the examination of a witness for the introduction of other evidence after adverse rulings by the court upon questions propounded by him, but he should not, after a question has been ruled inadmissible, continue to ask the same question or a like question, subject to the same objection, and if he does, there is a limit thereto at which the trial judge, who is present and in a position to observe his conduct and demeanor, may ask the witness to leave the stand.   But this, in our opinion, should not be done unless it is shown that the attorney is knowingly acting in violation of the ruling of the court and then only after being warned that such action will be taken if he continues to ask such questions.

The twenty-sixth and twenty-seventh exceptions were to the court's refusal to permit Woodall, superintendant of the morgue, to state the contents of its records relating to the body in question.   This ruling, we think, was correct, inasmuch as the record itself was the best evidence of what it contained; nor do we discover any reversible error in the court's rulings in the twenty-eighth exception.

The only ruling of the court left for us to pass upon is that upon the demurrer to the fourth or additional count of the declaration.

The clause of this count, hereinbefore set out, closes by saying "and the plaintiff further states that Frank Nash, the insured, had paid his dues and was in good standing up to the time of his death and that the plaintiff herein has complied with all the requirements of the insurance contract above set forth except those provisions that were waived by the defendant or which the defendant is estopped to rely upon."

The allegation of general performance of the plaintiff of the provisions of the certificate is, in our opinion, too indefi-

nitely stated. It says that the plaintiff complied with all the requirements of the contract *except those provisions that were waived* by the defendant or which the defendant is estopped to rely upon.

If a plaintiff anticipates the defense by alleging that some of the provisions of the contract, upon which the suit was brought, were not complied with by him because waived by the defendant, such claim, we think, should be stated with greater particularity than was done in this count of the declaration, though in this case we will not for such reason hold the count bad to the extent of saying the court in overruling the demurrer thereto committed a reversible error. But for other errors pointed out in the rulings of the court the judgment appealed from will be reversed.

> *Judgment reversed, and new trial awarded, the appellant to pay one-third of the costs of the record, the balance of the costs to be paid by the appellee.*