# CASES

## ARGUED AND DETERMINED

### IN THE

# SUPREME COURT OF MINNESOTA

---

LULU L. GOODIER v. MUTUAL LIFE INSURANCE COMPANY OF NEW YORK.[1]

January 11, 1924.

No. 23,725.

**When presumption of death supersedes presumption of continued life.**

1. Presumption of continued life of one who has disappeared from his home and the knowledge of his family, in the absence of proof to the contrary, continues for seven years. At the end of that time, and not until then, it ceases to operate and the presumption of death takes its place. The latter presumption is to the effect only that the missing one is not then alive and does not prove death at any precise time within the seven year period.

**No presumption of death before expiration of 7 years.**

2. When, to sustain a recovery, death must be proven within four years from the disappearance, resort must be had to the circumstances of the case, the presumption arising after seven years' absence being of no avail.

**Evidence insufficient to sustain recovery.**

3. G disappeared November 14, 1914. He was a lawyer who had embezzled considerable sums from numerous clients. His criminality was about to be discovered to his family and the world. Immediately after his disappearance, ten indictments were returned against him. Theretofore he had borne a good reputation, had been reasonably

[1]Reported in 196 N. W. 662.

prosperous and his family relations were of the best. Shortly before his disappearance he had suffered a nervous breakdown complicated by disturbances of digestion. At the time of the trial G had been absent more than seven years, but to sustain a recovery in this action it was necessary to prove death within four years after G disappeared. *Held* that there is no evidence to sustain a recovery, there being no showing that at the time of his disappearance, and from the illness which he was then suffering, G was in imminent peril of death or that death was likely to follow soon in the ordinary course of the disease.

Action in the district court for Ramsey county to recover $2,000 on a life insurance policy. The case was tried before Sanborn, J., who at the close of the testimony denied defendant's motion for a directed verdict in its favor, and a jury which returned a verdict in favor of plaintiff. From an order granting defendant's motion for judgment notwithstanding the verdict, plaintiff appealed. Affirmed.

*Douglas, Kennedy & Kennedy*, for appellant.

*Ambrose Tighe* and *Frederick L. Allen*, for respondent.

STONE, J.

Action by the beneficiary upon a policy insuring the life of her former husband, Wadsworth L. Goodier, wherein there was a verdict for plaintiff. Defendant moved in the alternative for judgment notwithstanding or for a new trial. The motion for judgment was granted and plaintiff appeals. This is a disappearance case, and, at the outset, we desire to make acknowledgment and express our appreciation of the extent to which our labors have been lightened, and our assurance of having reached the proper result increased, by the exhaustive memorandum of the learned trial judge.

Mr. Goodier was a lawyer at Utica, New York. He and plaintiff had enjoyed a happy matrimonial companionship of some 29 years. They had been blessed by three children, all of whom are a credit to the parents. To negative all other considerations, it is sufficient to state that there was no reason for Goodier's disappearance outside of the very serious financial difficulties soon to be related.

Goodier's professional standing seems to have been good. The record may not so indicate, but it is not likely that he ever had much of a trial or commercial practice. He had more to do with the handling of trusts of one kind or another and possessed the confidence of a considerable clientele. Many of his clients were women. He operated quite extensively in Utica real estate. In 1914 he was 56 years of age, and until September of that year had enjoyed good health. He then suffered a nervous disturbance somewhat serious in character. It continued into November when, for a short time, he was in a private sanatorium for treatment. There is a claim, but with slight evidence to support it, that he was suffering from "angina pectoris." Of that, more later. While in the sanatorium his letters to his wife were affectionate and cheerful in tone and indicate that the writer, whatever else he had to worry about, was not greatly concerned over the condition of his health. Neither in these letters nor elsewhere is there evidence that Goodier was of the morose or despondent type. Outside of the impending storm, brewed by his own unauthorized financial operations with the funds of others, there is nothing to indicate a reason for suicide, and no evidence of a tendency along that line.

It is probable that if Goodier had not disappeared, he soon would have taken up a somewhat protracted residence in the penitentiary. Immediately after his disappearance, ten indictments were returned against him and the record indicates that other transactions might have been the basis for criminal accusation.

We need not go into detail for it is sufficient to say that Goodier seems to have used the confidence of elderly men and women, who because of inexperience were equally helpless, as a means of appropriating to himself the small properties upon which undoubtedly they depended for their support. It is not to be wondered at that he disappeared from his usual haunts and the sight and knowledge even of his devoted wife and affectionate children.

Just before his disappearance on November 14, 1914, a lawyer friend, knowing of the danger in which he was and desiring, if possible, to secure the indulgence of the creditors, made an appoint-

ment with Goodier for a meeting at a hotel in Syracuse. The situation was such that this friend, Mr. Ferris, registered Goodier under an assumed name. That appointment was kept by Goodier, but he was not frank with Mr. Ferris, and disclosed only a minor part of his peculations.

The only baggage carried by Goodier to the sanatorium was a large Gladstone bag. Just before going to Syracuse for the appointment with Mr. Ferris, he sent his bathrobe home because "it was too heavy to carry." No one else expected him to leave the sanatorium at that time, but Goodier assuredly had made up his mind not to return. There is no evidence that any of the attendants expected him back, and he took with him all of the personal effects which he had carried from home. The Gladstone bag and its contents disappeared with the owner.

Goodier came to that conference from the sanatorium at Clifton Springs, a few miles west of Syracuse. So far as known, he has not been seen nor heard from since. Mr. Ferris bade him goodbye after their interview. All evidence of his continued existence ceased with his departure from the hotel. Some inquiry was made, but it was not as thoroughgoing as modern facilities make possible. No effort was made through metropolitan police channels or other similar agencies to locate Goodier.

Mrs. Goodier is a woman of such sense of honor and high regard for family name that she waived all exemptions and surrendered all property of any value for the benefit of her husband's creditors. The utmost exertions on their behalf have left their claims unpaid to the extent of 94 per cent, a fact which shows how complete was the financial cataclysm that overwhelmed the missing man.

After the surrender of her home, Mrs. Goodier left Utica, and for a part of the time since has resided in California. There, in 1919, she procured a divorce upon the ground of her husband's desertion. Whatever she may have believed, her complaint in the divorce action was a solemn assertion that her husband was then living. Giving the circumstances of the divorce a no more weighty evidentiary character than that of an admission, it is, at least, more persuasive than the ordinary admission against interest.

The policy in suit expired by its terms December 12, 1918. It is necessary, therefore, in order to sustain a recovery for plaintiff, to find in the record some evidence that Goodier died between November 14, 1914, when he last was seen at Syracuse, and December 12, 1918, when the policy lapsed. The jury not only found for plaintiff, but, in answer to a special interrogatory, fixed the time of his death at or about the date of his disappearance.

To hold that there was any proof of death at or about the time of disappearance, we would have to bring this case within the principle of those where the missing one, when last heard of, was in a position of peril. Davis v. Briggs, 97 U. S. 628, 24 L. ed. 1086. The typical case is that of one who starts upon a sea voyage and neither he nor anyone on board his ship nor the ship itself is ever heard from. In such a case, a finding of death is permissible after the lapse of the time within which the ship should have made port somewhere. Learned v. Corley, 43 Miss. 687, 688, and other cases reviewed in note, 104 Am. St. 206.

All the evidence urged upon us to bring Goodier's disappearance within that rule is referable to the testimony of Dr. Miller, the family physician, who attended him just previous to his disappearance. The doctor mentions angina pectoris, but seems to have been rather careful not to say that Goodier had anything other than "neuralgia or angina pains." This testimony was much limited on cross-examination when among other things he said:

"I was called to the house   *   *   *   in the fall of 1914. He was suffering from gastro-intestinal disturbances. Gastro enteritis would be an inflammatory disease of the stomach and intestines   *   *   * A gastro-intestinal disturbance was what caused absorption from the intestines of poisonous material, which being absorbed into the system gives blood pressure which in his case caused angina. The stomach disturbance was the root of the evil at that time. That is only a functional complaint. It does not show that there is anything wrong with the stomach   *   *   *   I went to see him first about three months before he went away. I saw him at intervals until his illness in November and at that time, he simply had some

stomach trouble and headache.   *   *   *   He was out and around.
*   *   *   During the three months he was naturally reticent and
during the last two weeks of his final illness he seemed to be in a
state of excitement and apparently apprehensive.   *   *   *   He was
in a state of depression.   *   *   *   I had already heard public
criticism of his business conduct.   There were rumors   *   *   *
that he was financially involved   *   *   *   and that he had been
guilty of some practices which doubtless were open to criticism.   I
think there were rumors that he had not been altogether honest in
some transactions.   *   *   *   His primary trouble was commonly
called nervous dyspepsia and disturbances of digestion allowing ab-
sorption into his system of material that caused angina-like chest
pains and he was also suffering from extreme nervous depression
and a state of mental apprehension for which condition I advised
that he go to Clifton Springs for treatment and rest."

Dr. Miller's examination concluded thus:          .

Q.   "And the angina to which you refer is not the true angina
but an angina as a symptom of some disturbance of some disease
elsewhere?"   A.   "Yes, sir."

Dr. Gibson examined Goodier in consultation with Dr. Miller in
November, 1914, and found the patient

"In bed, in a very nervous state of excitement, very anxious about
himself and very much distressed mentally.   *   *   *   Was also
complaining of severe pain in the region of his heart; there was
also considerable disturbance of digestion.   He seemed exceedingly
anxious to get up and attend to some business affairs which he
said were very pressing, and, as I remember it, Dr. Miller requested
me to call on Mr. Goodier largely to influence him to give up his
business affairs and rest.   I made an examination   *   *   *   and
did not at that time find him suffering among other things from
angina pectoris.   *   *   *   I advised him to stay in bed on the
assumption that his nervousness was the result of ordinary over-
work.   That he be accompanied to Clifton Springs by someone.
*   *   *   That is customary procedure with me with sick people.

\* \* \* I regarded the condition of Mr. Goodier serious at that time."

True, there is other evidence of a medical nature, but it is all of the opinion variety and for its fact basis expressly refers to the narrative of Dr. Miller. If there is any evidence justifying the conclusion that Goodier died immediately after he left the hotel at Syracuse, it is the testimony of Dr. Miller to the effect, in substance, that at the time he was suffering from a functional disturbance of the alimentary tract which produced as a symptom the so called angina pains of which so much is sought to be made.

The presumption of death attending disappearance, followed by seven years' absence with no tidings of the missing one and no evidence that he has been seen alive during that period, does not help plaintiff. That presumption cannot be permitted to show death at any time within the seven year period. It comes into operation at the end of seven years' absence simply as a logical substitute for the presumption of continued life which at that moment ceases to operate. Certainly the inference of death *after* seven years cannot by itself prove death *before* that time. Davis v. Briggs, supra. "The rule of the presumption \* \* \* extends merely to the *fact of death* from and after the end of the period; it is not understood to specify anything further, for example, the *time* of death within that period." Wigmore, Evid. § 2531, where, in a note, the authorities are gone into at length. (The "irreconcilable conflict of authority as to whether or not the presumption of death from absence raises any presumption as to the precise time of the death" is dealt with in the annotation of Butler v. Supreme Court, 26 L. R. A. [N. S.] 293).

The precise date of Goodier's death, if he be dead, is not material, except that his decease sometime between his disappearance and the lapse of the policy, a period of something over four years, must be shown. Obviously, the presumption of fact which the law would not apply to the situation until three years later, and then only to establish that Goodier was not *then* alive, does not assist in plaintiff's task of showing that Goodier was dead on December 12, 1918.

One thing which requires mention is the evidence of Goodier's illness for a time before his disappearance. That circumstance cannot be permitted to support the verdict unless we are ready to hold, as a matter of law, that, wherever a person in good health otherwise has reached the age of 56 and disappears, when if he did not adopt that course he was fairly sure to spend a goodly portion of the remainder of his life behind prison bars as a felon, he may be adjudged dead simply because he had an impaired heart action or was suffering from severe pains in the chest. Whatever conclusion may be open to the trier of fact, if the question arises seven years after disappearance, it seems obvious that, when it is presented at the expiration of only four years, a finding of death must rest wholly upon conjecture. Therefore, it is not open to court or jury in favor of one upon whom rests the burden of proving death.

Putting it somewhat differently, the question is this: Does his ill health at the time of the disappearance of a fugitive from justice, in the absence of evidence showing death to be imminent or probable soon, make possible the judicial conclusion that he died within four years? We think not and so hold. Judicial action is not controlled by its results. Neither is it blind to results, and it is somewhat of a deterrent to a contrary holding here, that it would put a premium upon rascality where its perpetrator had taken the usual precaution to have his life well insured.

The case is controlled by Spahr v. Mutual Life Ins. Co. 98 Minn. 471, 108 N. W. 4. True, there was lacking there the element of ill health. It is present here, but, since death was not imminent or likely to follow soon in the ordinary course of the disease, the circumstance does not support a finding of immediate death. Behlmer v. Grand Lodge A. O. U. W. 109 Minn. 305, 123 N. W. 1071, 26 L. R. A. (N. S.) 305, was a seven year case with a finding of death within a year after disappearance. In principle it is difficult to distinguish that case from this one. It has had our studious attention, but, for the reasons indicated, we cannot follow it here. There was not much reason in the case of Behlmer why, if he were not dead, he should not have communicated with his family. In the case of Goodier, the splendid character of his wife and children,

and the reputation he himself had always borne, were so much and so distinctly the opposite of his own criminality, about to be exposed to them and to the world, that there was every reason why he should disappear forever not only from their presence, but also from their knowledge.

Pierson v. Modern Woodmen of America, 125 Minn. 150, 145 N. W. 806, was a plain seven year case. True, Pierson may have been a defaulter, but there was no desire on the part of anyone to prosecute him. In the instant case, the absconder was not only sure of prosecution; he was sure of conviction and resulting precipitation from his former estate of a leading citizen in the community to a depth of degradation not reached by the ordinary criminal.

Swanson v. Modern Brotherhood of America, 135 Minn. 304, 160 N. W. 779, is another seven-year case. There, the insured just deserted his family and after seven years of absence without tidings from him, a jury held that he was no more, and that conclusion was not disturbed. Boynton v. Modern Woodmen of America, 148 Minn. 150, 181 N. W. 327, was another ordinary seven-year case.

Our most recent decision is that of Eklund v. Supreme Council of R. A. 152 Minn. 20, 187 N. W. 826, 17 A. L. R. 401. It was another seven-year case but there were other circumstances in the record upon which it was held that the jury properly concluded that death occurred within four years after the disappearance. The insured was a defaulter, but much was heard from him after his initial disappearance. For a long time he communicated with his family. During a stay in England he surrendered himself to the authorities there, who set him at liberty when they were informed that no criminal prosecution had been begun. He never returned to his family and finally there came a time when he was heard from no more. The proof of death at any particular time, while scant, was held to be for the jury.

State v. Plym, 43 Minn. 385, 45 N. W. 848, and Waite v. Coaracy, 45 Minn. 159, 47 N. W. 537, go simply to the general proposition that disappearance followed by seven years' absence is not proof of death within that time, and that the precise time of death, if material, must be determined from all the circumstances in evidence.

The cases are too numerous for much further citation. Inter alia, see Policemen's Benev. Assn. v. Ryce, 213 Ill. 9, 72 N. E. 764, annotated, 104 Am. St. 190 (198); Modern Woodmen of America v. Ghromley, 41 Okla. 532, 139 Pac. 306, annotated, L. R. A. 1915B, 728, Ann. Cas. 1915C, 1063. A much cited and oftquoted case is Tisdale v. Ins. Co. 26 Iowa, 170, 96 Am. Dec. 136. Its principle was erroneously applied by the trial court and led to a reversal in Northwestern Mut. Life Ins. Co. v. Stevens, 71 Fed. 258, 18 C. C. A. 107. That case, while similar to this, was far from being its counterpart. It is important to note that Judge Sanborn's opinion comments [page 261] on the peculiar circumstance that "there was no request for a peremptory instruction to the jury to find this important [fact of death] either way, and hence," he observed, "the question whether or not there was sufficient evidence in the case to warrant the finding of the death of the insured    *   •   *   is not presented for our consideration."

Therefore, what is said on the next page [262], to the effect that, had the jury been properly instructed, the circuit court of appeals would have been "unwilling to hold" that they might not lawfully have found death as the fact, "although there was no proof that the insured was last seen in the presence of an imminent peril" that might probably have caused his death, must be understood accordingly. In view of the fact that the sufficiency of the evidence was not before the court, it cannot be taken to have passed on that question at all.

Ordinarily, whether an insured is alive or dead is a question for the jury, but a verdict should be directed against the litigant having the burden of proof where there is no more evidence of death, at the time or within the period necessary to sustain a recovery, than there is here. To adopt any other view would remove cases of this kind from the control of law and permit their decision by wholly uncontrolled and always differing notions of facts.

Order affirmed.