## UNITED STATES v. ROBERTSON.
### No. 6141.

Circuit Court of Appeals, Ninth Circuit.
Oct. 27, 1930.

318

George Neuner, U. S. Atty., and Chas. W. Erskine and Francis E. March, Asst. U. S. Attys., all of Portland, Or., and William Wolff Smith, Gen. Counsel, U. S. Veterans' Bureau, and Lawrence A. Lawlor, Atty., U. S. Veterans' Bureau, both of Washington, D. C.

Ralph H. King, McCamant & Thompson, and Elton Watkins, all of Portland, Or., for appellee.

Before DIETRICH and WILBUR, Circuit Judges, and WEBSTER, District Judge.

WILBUR, Circuit Judge.

Appellee brought this action on a policy of war risk insurance issued to Edward H. Robertson, who entered the military service of the United States in Detroit, Mich., in September, 1917, and was discharged at Camp Custer, Mich., January 21, 1919. The policy lapsed for nonpayment of premium on the 1st day of March, 1919, no premium thereon having been paid after the date of discharge. It is alleged that the insured died before the 1st day of March, 1919, when the policy lapsed. The verdict and judgment were in favor of the claimant, and the government appeals.

It is contended on appeal that motion for directed verdict should have been granted on the ground that plaintiff failed to prove the death of the insured before March 1, 1919. Appellee relies largely upon the presumption of death arising after an absence of seven years and from the claim that the actual time of death after the lapse of that period is a question for determination of the jury, and the findings of the jury that the insured died before the 1st day of March, 1919, is supported by the evidence and the presumption. Before discussing the law applicable to the case we will state, as briefly as may be, the nature of the evidence thus relied upon by the appellee, who was the mother of the insured.

The insured was born May 4, 1894, at Akron, Iowa. When he was four years of age the family moved to Vancouver, Wash., and a few months later moved to Toledo, Wash., where they lived about four years. The family moved back to Vancouver, Wash., where they lived for six years, during which time the father of the insured died; the mother then moved with her son, the insured, to Gilmore Valley, Wash., where the mother took up a homestead. The elder sister had married in the meantime and her husband, Harold M. Brown, had taken up a homestead near there. The insured remained on the homestead until 1912. His mother moved to Woodburn, Or., in that year, leaving her son on the homestead. She later moved to Portland, Or., where her son visited her in 1913. He remained in Portland a few weeks in the Pullman yards, then went to another place in Oregon, where he worked for a short time, and then came back to Portland, Or. He then removed to Sacramento Valley, Cal. He worked at Celilo Locks in 1913, after he had been in Fresno, Cal. The insured wrote to his mother irregularly, once a month or six weeks, while he was working at Celilo Locks. Afterwards he came to Portland and visited his mother. He was in Portland for about a month. He visited some other place in Oregon not designated for two or three weeks and then returned to Portland and then went to California, near Fresno, in 1914. While in Fresno his mother heard from him "every three or four or six weeks, something like that." He also sent his mother some money in his letters, she says, "not much, $5 or $10." His mother continued to hear from insured until the latter part of 1916. She testified: "The last time I heard from him was in the latter part of 1916, in the fall." The mother explains her failure to hear from her son after 1916 by the statement that told her son she was going to her daughter's in Canada, and that she did leave Portland in 1916 and went to her daughter at Condon, Or., to which place the daughter had removed. She received a letter from her son when she was in Condon, Or., which had been addressed to her at Portland. She had told her son to send his letters to Portland. The mother was taken sick and went to Woodburn, Or., to some friends. While the mother was at Woodburn she wrote her son that her daughter was coming back from Canada, but this letter was returned. The letter received by the mother at Condon, Or., was postmarked the 1st part of December, but was received two and one-half or three months afterwards. The mother continued to live in Condon with her daughter from November, 1916, until the winter of 1919, in February. After the return of her letter written to her son from Woodburn, the mother wrote him again from Condon, but this letter was addressed to her son in Fresno and was also returned to her. "From 1917 to January, 1919, I didn't have any word from my son." It thus appears that as early as

the latter part of 1916 the mother and son had lost contact with each other and the contact was never thereafter re-established. In 1919 the mother wrote to the War Department about him and in the same year her son-in-law's sister wrote her that her son had visited her. In this letter Mrs. Weeks stated that the son had asked for his mother's address and told her that he thought his mother was in Canada. Mrs. Weeks gave him the mother's address and he told Mrs. Weeks that he was going east. The mother remained in Condon until February, 1919, when she came to Portland, doing housework. The insured's sister and husband lived in Condon two and one-half years after the mother left there. The mother testified that she wrote to the War Department asking about her son's discharge, to the postmaster at Fresno, Cal., and that she obtained a list of all the members of his company at the time they were stationed in Powers, Or., and wrote to every one of them. These letters were written in 1929, the members of the company were scattered from Ohio to California. She received twenty-five answers from persons who stated they were members of the 102d Spruce Squadron. In these letters they either stated they were not with the company at Powers, Or., or that they had never heard from the insured after his discharge. Seventeen letters written to members of the company were returned unclaimed. The mother testified that she had not heard a word directly or indirectly from her son since the message from Mrs. Weeks in January, 1919; that during the time her son was away at the various places mentioned she received a letter from him every four to six weeks up to 1916. The mother testified that she never had any trouble with her son and that he was an affectionate son. "When he was not away at work at some of these jobs he stayed in Portland and was with me in the day time, but I was working and he had a room over town." From 1910–12 the insured maintained his home with relatives of his in Washington on a homestead. She testified that in 1910 to 1916 her son came to see her every time he was in Portland, but did not live with her as she was working and did not have a home. She had not seen her son since 1914. The War Department informed her her son had enlisted at Detroit, Mich. The last place of residence the mother knew that her son maintained was in the state of California.

The witness, Orpha Weeks, a sister of the son-in-law of Mrs. Robertson, testified that the first time she had seen the insured after 1913 was in 1919, when he came into her husband's office in Vancouver, Wash., which was within half a mile of Vancouver barracks; that he then asked after his folks and asked for his mother's address, which she gave him; that he then stated he was going away that night to be discharged at Camp Custer, Mich. He said he would return to Condon immediately after his discharge. He was there only fifteen minutes and said this was the only leave he could get in the Army. "He asked me how to reach Condon, saying he was coming back by way of Spokane, and I informed him to transfer at Arlington, Oregon." The witness told the insured that she expected to go to Condon in a month, to which he replied, "Well, I will see you then." The insured told Mrs. Weeks that he lived at Fresno, Cal.; that he was going back there after he made his mother a visit.

The insured's only sister, Mrs. Harold M. Brown, testified that her brother showed affection toward his mother and was friendly toward all the family when he visited them; that he gave his mother money while here on visits; that he sent money to his mother to fix up his father's grave, and that he had given her money at various times. The sister testified that they did not hear directly or indirectly from the insured after the month of January, 1919. The sister testified that her brother never wrote to her, but that she learned of her brother from her mother. In February or March, 1919, a letter was received at the Condon post office addressed to the insured in care of Mrs. Ida M. Robertson, Condon, Or. This letter was from the War Department and contained a sergeant's commission in the 102d Spruce Squadron, United States Army, dated January 14, 1919, but fixing the date of his rank as such as the 23d day of November, 1918. The witness testified that since 1919 she had never heard a word, directly or indirectly, from the insured.

John M. Rosander testified that he was a resident of Ethel, Wash.; that he became acquainted with the insured at Powers, Wash., while both were in the Army. He bunked in the same barracks with the insured at Powers and talked with him frequently. He told him that he had lost track of his mother and could not get hold of her address so as to write to her or get in correspondence in any way with her. This was in 1919. They removed to Vancouver barracks and remained there from January 1 to January 7, 1919.

A. J. King, a member of the same company, testified that he knew the insured, that

they were together in Powers, Or., and later in Vancouver, but, after witness was discharged, in January 13, 1919, he had never heard from the insured.

The government introduced records showing that the insured was examined on August 10, 1917, at Detroit, Mich., and found to be fit and qualified for military service. The examination was made at the place of mobilization at Camp Custer, Mich. The insured at the time of his mobilization gave his residence as 239 Bush street, Detroit, Wayne county, Mich., and the place of enlistment, Detroit, Mich., September 19, 1917. He gave as the address of the person to be notified in case of emergency, Dr. A. J. Struble, uncle, Centerville, S. D. These records showed that the insured was discharged January 21, 1919, and gave as his address for future reference, Condon, Or. The record thus introduced contained a statement made by the insured that at that time he had no reason for believing that he was suffering from the effects of any wound, injury, or disease, or that he had any disability or impairment of health incurred in the military service. There was also a certificate of the medical officer of the Army that he had examined the insured on January 20, 1919, and had found him to be physically and mentally sound.

The question then is, What is there in this evidence which would require or justify a conclusion that a man who is in perfect health on January 21, 1919, was dead within six weeks thereafter? The only suggestion made by the appellee in answer to this question is that the insured had declared and manifested an intention to visit his mother at Condon, Or., and did not do so. The contention is that the presumption of death arises from the absence of the insured for a period of seven years. It is therefore presumed that he is now dead. It is contended that it is for the jury to say when the insured died after the fact of death had been established by the presumption, and that therefore the evidence that the insured intended to visit his mother in Condon, Or., shortly after his discharge is sufficient foundation for the verdict of the jury that he died on or before March 1, 1919. One of the primary difficulties in this case is to determine when the insured disappeared within the meaning of the rule which starts the seven-year period of disappearance running. That disappearance is ordinarily from the home or domicile of the person whose disappearance is involved. The presumption arises because of the fact that the person no longer appears in his accustomed place, and that no sufficient reason is given for his disappearance. The mere removal from one place to another does not give rise to the presumption of death or start the seven-year period running. Nor did the insured disappear in this case. He lost contact with his mother in 1916. He was not then living with her and did not then or thereafter correspond with her, but he did not disappear. He was moving about from place to place, working, and corresponding with his mother, but he lost track of her because she told him she was going to Canada and instead went to another place. We need not pause to inquire whether, if he had written to her address as she requested, she would have received the letter, for she in fact did so on one occasion, but, apparently, before she received the letter he had moved to another place. In 1917 we find him giving his residence as Detroit, Mich., although he stated to his brother-in-law's sister that he intended after discharge to return to Fresno, Cal. The only effort, as far as the record discloses, to ascertain whether he went to Fresno, Cal., is an inquiry of the postmaster and the Legion Post at that place. Great stress is laid upon the proposition that the insured sent word to his mother by Mrs. Weeks that he intended to visit her in Condon, Or. He evidently directed the War Department to send his mail to that place. It may be assumed that he intended to visit Condon, Or. It is, however, clear that he did not intend to reside there. The utmost possible effect to be given to his failure to arrive at Condon, Or., as he stated he intended to do, is that his failure to visit his mother as he planned constituted a disappearance within the meaning of the rule which starts the seven-year period running. We do not say that this is sufficient. We merely say that the utmost possible effect of this circumstance is to start the period running. If this be true there is absolutely nothing in the record to fix an earlier period than the end of the seven-year period for his death. That would be some time in February, 1926. The decisions upon this subject are numerous, both in this country and in England. It is thoroughly established after a disappearance of seven years a presumption of death arises. This rule has been adopted by legislation in many of the states, including Oregon. As to the time when death is presumed to occur, the authorities in England and the United States are not in harmony. In some of our states it is determined that, where the fact of death is deduced from presumption alone, death is presumed to occur on the last day of the seven-year period. This rule is announced in some of the decisions of the federal courts. Montgomery v. Bevans, Fed.

Cas. No. 9735 [Cal.] by Judge Field; see, also, Davie v. Briggs, 97 U. S. 628, 24 L. Ed. 1086; Fidelity Mut. Life Ass'n v. Mettler, 185 U. S. 308, 22 S. Ct. 662, 46 L. Ed. 922. This rule is also followed in Maryland, Brotherhood of Locomotive Firemen & Engineers v. Nash, 144 Md. 623, 125 A. 441; in New York, Connor v. N. Y. Life Ins. Co., 179 App. Div. 596, 166 N. Y. S. 985; Illinois, Apitz v. Supreme Lodge Knights and Ladies of Honor, 274 Ill. 196, 113 N. E. 63, L. R. A. 1917A, 183; Wisconsin, Dobelin v. Ladies of the Maccabees of the World, 171 Wis. 54, 174 N. W. 897. On the other hand, it has been held by the majority of the state courts that, the presumption of death having once arisen by reason of the lapse of seven years, it is a question for the jury to determine at what particular time during the seven-year period the death occurred, but the burden in such case is upon the person who seeks to establish the fact of death at a particular time. Haddock v. Meagher, 180 Iowa, 264, 163 N. W. 417; Goodier v. Mut. Life Ins. of N. Y., 158 Minn. 1, 196 N. W. 662, 34 A. L. R. 1383; N. Y. L. Ins. v. Brame, 112 Miss. 828, 73 So. 806, L. R. A. 1918B, 86; In re Buck's Estate, 204 Mo. App. 1, 220 S. W. 716; Bonslett v. N. Y. L. Ins. Co. (Mo. Sup.) 190 S. W. 870; Masters v. Modern Woodmen of Am., 102 Neb. 672, 169 N. W. 1; Beard v. Sov. Lodge, W. O. W., 184 N. C. 154, 113 S. E. 661; Lewis v. Lewis, 185 N. C. 5, 115 S. E. 885; White v. Brotherhood Loc. Firemen, 165 Wis. 418, 162 N. W. 441; Gaffney v. Royal N. of Am., 31 Idaho, 549, 174 P. 1014; Glasscock v. Weare, 192 Ky. 654, 234 S. W. 216. It is not for the jury to fix the date of death by a mere speculation or guess. We believe the correct rule in that regard is stated in an opinion by Justice Lairy of Division No. 2 of the Appellate Court of Indiana in Metropolitan Life Ins. Co. v. Lyons, 50 Ind. App. 534, 98 N. E. 824, 826, as follows: "A court or jury in such a case is not warranted in finding death as a fact from facts and circumstances in evidence which would be sufficient only to create a presumption of death after the lapse of seven years; but additional facts and circumstances may be shown which will warrant such a finding."

In the case at bar there is no fact or circumstance justifying the fixing of the date of death by the jury. All the evidence directed to that end merely establishes at most a disappearance for a period of about ten years.

Judgment reversed.

WEBSTER, District Judge, concurs.