### DAVIE v. BRIGGS.

1 A person who for seven years has not been heard of by those who, had he been alive, would naturally have heard of him, is presumed to be dead; but the law raises no presumption as to the precise time of his death.

2. The triers of the facts may infer that he died before the expiration of the seven years, if it appears that within that period he encountered some specific peril, or came within the range of some impending or imminent danger which might reasonably be expected to destroy life.

3. This court adopts the construction of the Supreme Court of North Carolina that the term "beyond the seas," where it occurs in the Statute of Limitations of that State, means "without the United States."

APPEAL from the Circuit Court of the United States for the Western District of North Carolina.

The history of this litigation is substantially as follows: —

The land, containing about two hundred acres, the proceeds of which are involved in this suit was conveyed in the year 1829, for the consideration of $6,000, by John Teague, its then

owner, to F. W. Davie, of South Carolina, a brother of Allen Jones Davie. In the succeeding year, F. W. Davie leased it, upon certain terms and conditions, to one McCulloch, for the term of twenty years, and in 1831, for the consideration of $5,000, he conveyed to the latter an undivided one-third of the whole tract, with the exclusive right to direct and manage the working of the mines thereon and to receive one-third of the profits arising therefrom, and a few months thereafter he, for the consideration of $3,000, conveyed an undivided third of the same tract, with all the emoluments and profits arising therefrom, to his brother, Hyder A. Davie.

The complainants claim that subsequently, on the 15th of January, 1833, F. W. Davie, in accordance with an agreement, which at the time of his purchase from Teague he made with Allen Jones Davie, conveyed the remaining undivided third of the tract to Cadwalader Jones, Sen., with all the rights and privileges thereunto belonging, in trust, to permit said Allen, his wife, and their children then living or thereafter resulting from their marriage, to have and receive the rents, profits, and issues of the said premises, and of all mines thereon found, for the joint use of said Allen, his wife and children, during the lifetime of the said Allen, and after his death to permit his wife and children to receive the said rents, profits, and issues, and after the death of the wife to convey the premises, &c., to such children and their issue, free and discharged from all trusts whatsoever; the conveyance, however, being upon the condition that the land and mines should be liable for one-third of such amount as upon settlement should be found to have been expended by F. W. Davie in working the mines. Upon that conveyance, which was never registered, and is alleged to have been lost, the complainants, heirs-at-law of said Allen, rest as the foundation of their right to the relief asked. The defendants deny that any such conveyance was ever executed and delivered by F. W. Davie as his act and deed. Said Allen, at the time of its alleged execution and delivery, was residing upon the land with his family, and had some connection with the working or management of the mines, the precise nature of which does not appear. Difficulties occurred between him and McCulloch, which gave rise to a suit in 1833 in the equity

court of Guilford County, in the name of "Allen Jones Davie and others," against McCulloch. The papers in that suit had all disappeared when this was commenced, and nothing remained to indicate the nature of the issues but a few scattered minutes upon the trial docket. From them it appears that an injunction of some kind was granted against McCulloch which interfered with his mining operations. By an order made in 1836, the master was directed to ascertain the damages which. McCulloch sustained by reason of the injunction. The final order in that case seems to have been made in 1840, in the Supreme Court, to which it was transferred. for trial. That order is in these words: "The deeds mentioned in the rules made at the last term in this cause not having been exhibited and filed in the office of this court by the time therein directed, it is ordered that the plaintiffs' bill be dismissed out of this court, with costs to be taxed by the proper officers, but without prejudice to the plaintiffs' right to file another bill."

No other bill appears to have been filed. These minutes do not show who were complainants in that suit with Allen Jones Davie, or to what deeds the order of 1840 referred. Not long after that litigation, Allen Jones Davie removed from the vicinity of the mines to Hillsboro', N. C., and subsequently to South Carolina.

In 1848, McCulloch, for the consideration of $2,000, made a quitclaim deed to John Gluyas for the undivided third of the land conveyed to him by F. W. Davie in the year 1831. In the same year, Hyder A. Davie died, having by his last will devised and bequeathed to F. W. Davie, L. A. Beckham, and W. F. Desarre his whole estate, real and personal, in trust for the sole and separate use of his daughter, Mrs. Bedon. On the 2d of March, 1850, F. W. Davie made two deeds (which were duly recorded on the same day) to Beckham, one to him individually, for an undivided third of the land for the expressed consideration of $2,000, and the other to him for an undivided third of the same land, in trust for Mrs. Bedon, the consideration therefor, as recited, being $3,000, previously paid to the grantor by Hyder A. Davie. Within a few weeks after the making of these two last deeds, F. W. Davie died at his home in South Carolina. On 9th April, 1850 (whether F. W. Davie was then alive

does not appear), Beckham leased an undivided two-thirds of the tract to Briggs for the term of five years, and the latter, on June 12, 1850, assigned that lease to John Peters and M. L. Holmes. During the succeeding year, Allen Jones Davie started for California by the overland route, and was never heard from after he had reached in his journey the hostile Indian Territory. In 1852, John Gluyas conveyed, by quitclaim deed, to John Peters and M. L. Holmes the undivided one-third which he had previously acquired from McCulloch; and in 1853 M. L. Holmes conveyed to R. J. Holmes one-eighteenth of the part purchased from Gluyas and a one-sixth interest in the lease taken by Holmes and Peters from Briggs. Under the foregoing deeds and leases, Peters, Sloan, & Co., for a time, worked the mines; and in June, 1853, they joined with Beckham in selling and conveying the property by separate deeds to the Belmont Mining Company, at the price of $125,000, which was paid to Peters, Sloan, & Co. Of that sum, it was agreed between the parties selling that Peters, Sloan, & Co. were entitled to $81,666.66, while Beckham, in his individual right and as trustee for Mrs. Bedon, was entitled to receive $43,333.33. Before this transaction, however, was consummated by a division of the funds among the respective parties, a written notice, dated July 23, 1853, signed by the attorney of "Cadwalader Jones and the heirs of Allen Jones Davie, deceased," was served upon Peters, Sloan, & Co., to the effect that "one-third of the purchase-money for which the McCulloch mine in the county of Guilford has lately been sold is claimed by Colonel Cadwalader Jones, as trustee, for the use and benefit of the children and heirs-at-law of Allen J. Davie, by a deed from F. W. Davie, bearing date the 15th January, 1833." They were, by that notice, "requested and notified to retain one-third of said money" in their hands "for the use of said heirs, and not to pay out said third to any person or persons without the consent of Col. C. Jones." This notice induced Peters, Sloan, & Co. to suspend any final settlement and division with Beckham. In the fall of 1853, it seems that Cadwalader Jones, Jr., a son of the trustee named in the deed of Jan. 15, 1833, was employed by the latter, and by William R. Davie, to establish the claim of the heirs of Allen Jones Davie to said land and mines. After his

employment, Cadwalader Jones, Jr., appears to have had some negotiations with Beckham, which resulted in the latter's executing, in the presence of Sloan, of Peters, Sloan, & Co., and Cadwalader Jones, Jr., a paper, of which the following is a copy : —

"STATE OF NORTH CAROLINA, *Guilford County :*

"Whereas Peters, Sloan, & Co. held one-third of the McCulloch gold-mine in Guilford County, under John Gluyas, Charles McCulloch, and William F. Davie, and whereas they had a lease from Lewis A. Beckham in his own right, and as trustee of Mrs. Julia Bedon, for two-thirds of said mine for a period the lease will show;

"Whereas said Peters, Sloan, & Co. worked the said mine for some year or two, and paid one-seventh of the two-thirds of all the gold extracted whilst they worked the mine to said Lewis A. Beckham for himself, and as trustee aforesaid;

"Whereas Peters, Sloan, & Co. sold their interest in said mine for \$82,333.33;

"Whereas Lewis A. Beckham sold his interest in said mine for \$21,333.33, and his interest as trustee aforesaid for the same sum;

"Whereas Col. Cad. Jones, of Hillsboro', as trustee, claiming the one-third of said mine as trustee for Allen J. Davie, wife and children, as he alleges under a deed from William F. Davie;

"Whereas James Sloan, one of the firm of Peters, Sloan, & Co., collected for Lewis A. Beckham his part and the part of Julia Bedon, to wit, \$41,666.66;

"Whereas it is the wish of all the parties for the said several parties to receive the said several purchases without prejudice to the legal or equitable claim of Col. Cad. Jones;

"It is agreed that whatever claim the said Cad. Jones had in said gold-mine he shall have against the several parties who have sold and received the purchase-money instead of the land itself. And the said Lewis A. Beckham hereby agrees to acknowledge service of any bill in equity which the said Cad. Jones and his *cestui que trust* may in equity file against himself or against himself and others in Guilford County, North Carolina, waiving all questions as to jurisdiction, to settle any and all questions of title and right the said Cad. Jones, trustee, or his *cestui que trust*, have or may have for the said purchase-money, or the rents and profits received whilst he had any thing to do with the said mines.

(Signed)      "L. A. BECKHAM.

"APRIL 28, 1854."

Beckham died in 1860 or 1861. His estate was insolvent. In July, 1874, this suit was instituted for the purpose of either obtaining a partition of the land or a portion of the proceeds of the sale. In the progress of the suit the complainants elected to claim an interest in the proceeds of the sale. Among the defendants are the Belmont Mining Company, James Sloan, M. L. Holmes, and R. J. Holmes, whom the complainants seek to hold liable for their alleged interest in the proceeds of sale. Upon final hearing the bill was dismissed, and the complainants appealed.

The cause was argued by *Mr. James Lowndes* and *Mr. Edward McCrady, Jr.*, for the appellants, and by *Mr. Samuel F. Phillips* for the appellees.

MR. JUSTICE HARLAN, after stating the case, delivered the opinion of the court.

The appellants, as the heirs-at-law of Allen Jones Davie, deceased, assert an interest in the proceeds of a sale which took place in June, 1853, of a tract of land in Guilford County, North Carolina, known many years ago as the McCulloch gold-mine.

Whether the defence, so far as it rests upon the Statute of Limitations of North Carolina, can be sustained, depends upon the evidence as to the time when Allen Jones Davie died. The learned counsel for appellants insist that, consistently with the legal presumption of death after the expiration of seven years, without Allen Jones Davie being heard from by his family and neighbors, the date of such death should not be fixed earlier than the year 1858. In that view, — excluding from the computation of time the war and reconstruction period between Sept. 1, 1861, and Jan. 1, 1870, as required by the statutes of North Carolina (*Johnson* v. *Winslow*, 63 N. C. 552), — the suit, it is contended, would not be barred by limitation. The general rule undoubtedly is, that " a person shown not to have been heard of for seven years by those (if any) who, if he had been alive, would naturally have heard of him, is presumed to be dead, unless the circumstances of the case are such as to account for his not being heard of without assuming his death." Stephen, Law of Evid., c. 14, art. 99; 1 Greenl. Evid.,

sect. 41; 1 Taylor, Evid., sect. 157, and authorities cited by each author. But that presumption is not conclusive, nor is it to be rigidly observed without regard to accompanying circumstances which may show that death in fact occurred within the seven years. If it appears in evidence that the absent person, within the seven years, encountered some specific peril, or within that period came within the range of some impending or immediate danger, which might reasonably be expected to destroy life, the court or jury may infer that life ceased before the expiration of the seven years. Mr. Taylor, in the first volume of his Treatise on the Law of Evidence (sect. 157), says, that "although a person who has not been heard of for seven years is presumed to be dead, the law raises no presumption as to the time of his death; and, therefore, if any one has to establish the precise period during those seven years at which such person died, he must do so by evidence, and can neither rely, on the one hand, on the presumption of death, nor, on the other, upon the presumption of the continuance of life." These views are in harmony with the settled law of the English courts. *In Re Phene's Trust*, Law Rep. 5 Ch. 139; *Hopewell v. De Pinna*, 2 Camp. N. P. 113; *Reg. v. Lumley*, Law Rep. 1 C. C. 196; *Re Lewes's Trusts*, Law Rep. 11 Eq. 236; 32 Law J. Ch. 104; 40 id. 507; 29 id. 286; 37 id. 265. In the leading case in the Court of Exchequer of *Nepean v. Doe dem. Knight* (2 Mee. & W. 894), in error from the Court of King's Bench, Lord Denman, C. J., said: "We adopt the doctrine of the Court of King's Bench, that the presumption of law relates only to the fact of death, and that the time of death, whenever it is material, must be a subject of distinct proof." To the same effect are Mr. Greenleaf and the preponderance of authority in this country. 1 Greenl. Evid., sect. 41; *Montgomery v. Bevans*, 1 Sawyer, 653; *Stevens v. McNamara*, 36 Me. 176; *Smith v. Knowlton*, 11 N. H. 191; *Flynn v. Coffee*, 12 Allen (Mass.), 133; *Luing v. Steinman*, 1 Metc. (Mass.) 204; *McDowell v. Simpson*, 1 Houst. (Del.) 467; *Whiting v. Nicholl*, 46 Ill. 230; *Spurr v. Trumble*, 1 A. K. Mar. (Ky.) 278; *Doe ex dem. Cofer v. Flanagan*, 1 Ga. 538; *Smith v. Smith*, 49 Ala. 156; *Prim v. Stewart*, 7 Tex. 178; *Gibbes v. Vincent*, 11 Rich. (S. C.) 323; *Hancock v. American Life Insurance Co.*, 62 Mo. 26, 121; *Stouvenal v.*

*Sepkins*, 2 Daly (N. Y.), 319 ; *McCartee* v. *Camee*, 1 Barb.
(N. Y.) Ch. 456.   And such seems to be the settled doctrine in
North Carolina.   In *Spencer* v. *Moore* (11 Ired. 160), the Chief
Justice of the Supreme Court of that State said : " The rule as
to the presumption of death is, that it arises from the absence of
the person from his domicile without being heard from for seven
years.   But it seems rather to be the current of the authorities
that the presumption is only that the person is then dead,
namely, at the end of seven years; but that the presumption
does not extend to the death having occurred at the end, or any
other particular time within that period, and leaves it to be
judged of as a matter of fact according to the circumstances,
which may tend to satisfy the mind, that it was at an earlier
or later day."   The question again arose in the subsequent case
of *Spencer* v. *Roper* (13 id. 333, 334), when that court reaffirmed
*Spencer* v. *Moore*, and, referring with approval to the doctrine
announced by the Court of King's Bench in *Doe dem. Knight*
v. *Nepean* (5 Barn. & Adol. 86, same case as 2 Mees. & W.
894, *supra*), said : " Where a party has been absent seven years
without having been heard of, the only presumption arising
is that he is then dead, — there is none as to the time of his
death."

We therefore follow the established law when we inquire
whether, according to the evidence, Allen Jones Davie died at
an earlier date than at the end or expiration of the seven years
when the legal presumption of his death arose.   It seems to us
that, upon the showing made by the complainants themselves,
the conclusion is inevitable that he died some time during the
year 1851.   As early as July 23, 1853, a written notice was
given to Peters, Sloan, & Co., in which they were advised that
Colonel Cadwalader Jones and the children of Allen Jones
Davie claimed an interest in the proceeds of the sale made
by them and Beckham in June, 1853, to the Belmont Mining
Company.   That notice was signed by " Ralph Gorrill, sol'r
of C. Jones *and the heirs of A. J. Davie dec'd.*"   The notice
is produced and relied upon by the complainants in support of
their claim.

Further, in the seventh paragraph of the complainants' bill
they say, " That the said Allen Jones Davie departed this life,

as it is believed, some time in the year 1851, but the precise
date of his death is not known, nor can any direct proof be
obtained, nothing having been heard from him since the ——
day of November, 1851, when some of a party with whom he
had undertaken a journey by land to California, through the
country of hostile Indians, returned, saying that the party had
been some time fighting the Indians when they left, but that
said Allen Jones Davie, with the rest of the party, resolved to
press on and fight their way across the country, in which strug-
gle it is believed that he, with the rest of the party, perished,
as none of them have ever been heard of since." Again, in the
deposition of Cadwalader Jones, Jr., we find this language:
" As to Allen Jones Davie, the precise time of his death has
never been ascertained, but he perished (it is supposed) in the
Indian Territory, April or January, in the year 1851, and has
never been heard of since." But this is not all the evidence
in the record upon this point. In a statement of " admitted
facts," filed in the cause, we find the following: " That the
time of the death of Allen Jones Davie is not known, but his
death is supposed to have happened late in the fall of 1851, say
1st December, since which time he has not been heard from."

In view of this evidence, we cannot accept as absolutely
controlling the legal presumption which, in regard to Allen J.
Davie's death, arose at the expiration of seven years from the
time when he was last heard from. We cannot determine the
rights of the parties upon the hypothesis that his death occurred
in the year 1858, when the appellants themselves and their
chief witnesses not only unite in declaring their belief that
he died in 1851, but state facts which fully justify that belief.
Concluding then, as we must, that he died in the year 1851,
it seems clear that the claim set up in the bill to an interest
in the proceeds of the sale of June, 1853, is barred by the limi-
tation of three years prescribed by the North Carolina stat-
ute; and it does not appear that any of the complainants are
protected by the savings made in the statute for the benefit of
infants and *femes covert.*

But it is contended that, in view of the absence of the ap-
pellants from North Carolina for many years prior to the
sale of 1853, and their continuous absence since that date,

their rights are protected by the saving in the North Carolina statute in favor of persons who, having causes of action, were " beyond the seas " when they accrued.

We are not unaware of the construction which this court has in several decisions placed upon the phrase " beyond the seas," as used in statutes of limitation.   In *Faw* v. *Roberdeau* (3 Cranch, 173), this court, in considering the meaning of the words " out of this Commonwealth," as employed in a Virginia statute of limitations, said : " Beyond sea and out of the State are analogous expressions, and are to have the same con· struction."   In *Murray's Lessee* v. *Baker et al.* (3 Wheat. 541), involving the construction of a Georgia statute of limitation, this court held that the words " beyond the seas " must be held to be equivalent to " without the limits of the State." In *Bank of Alexandria* v. *Dyer* (14 Pet. 141), the same views were expressed as to a Maryland statute of limitations.   While the court in that case approved the interpretation of the words " beyond the seas " as given in previous decisions, it said that its construction was in harmony with the uniform decisions of the courts of Maryland.   In *Shelby* v. *Guy* (11 Pet. 366), the court was required to interpret the same words in a statute of limitation which was in force in Tennessee before its separation from North Carolina.   Mr. Justice Johnson, in his opinion, remarked that it was neither sensible nor reasonable to construe these words according to their literal signification.   Upon the suggestion, however, that a contrary decision had then recently been made in Tennessee, the court withheld any positive declaration upon the point, in the hope that the courts of the State would, in due time, furnish such lights upon its settled law as would enable this court to come to a satisfactory conclusion upon the question.   The court at the same time decided, as they had previously done in *Green* v. *Lessee of Neal* (6 Pet. 291), and as they subsequently did in *Harpending* v. *The Dutch Church* (16 Pet. 455), and *Leffingwell* v. *Warren* (2 Black, 599), that the fixed and received construction by the State courts of local statutes of limitation furnishes rules of decision for this court, so far as such construction and statutes do not conflict with the Constitution of the United States.

Guided by the doctrines of these cases, let us inquire

whether the phrase "beyond the seas," used in the statutes of North Carolina, has received a fixed construction in the courts of that State. As early as 1811, in the case of *Whitlock* v. *Walton* (2 Murph. 23, 24), the Supreme Court of North Carolina construed the words "beyond the seas," which were used in the Statute of Limitations of 1715. It was there claimed that a citizen of Virginia, who had a cause of action against a citizen of North Carolina, but who failed to sue within the period fixed by the statutes, was within the saving made for the benefit of those "beyond the seas." But the Supreme Court of that State said: "The plaintiff is certainly not within the words of the proviso, and it does not appear to the court that he falls within the true meaning and spirit of it. Great is the intercourse between the citizens of this State and the citizens of other States, particularly adjoining States; and if suits were permitted to be brought on that account against our own citizens, at any distance of time, by citizens of other States, the mischief would be great." That case was approved in *Earle* v. *Dickson* (1 Dev. 16), decided in 1826. We have been referred to no later case in that court which, in any respect, modifies these decisions. Consequently, our duty is, without reference to our former decisions, to adopt, in this case, the construction which the Supreme Court of North Carolina has given to the limitation statute of that State. In so doing, we pursue the precise course marked out in the case of *Green* v. *Lessee of Neal* (*supra*), where this court said: "In the case of *Murray's Lessee* v. *Baker, &c.* (3 Wheat. 541), this court decided that the expressions 'beyond seas' and 'out of the State' are analogous, and are to have the same construction. But suppose the same question should be brought before this court from a State where the construction of the same words had been long settled to mean literally 'beyond seas,' would not this court conform to it?" The question was answered by saying that "an adherence by the Federal courts to the exposition of the local law, as given by the courts of the State, will greatly tend to preserve harmony in the exercise of the judicial power in the State and Federal tribunals." *Supervisors* v. *United States*, 18 Wall. 82; *Suydam* v. *Williamson*, 24 How. 427.

It results that the absence of the complainants from the State of North Carolina, but within the United States, does not bring them within the saving made for persons "beyond the seas."

But upon this branch of the case we are met with the additional argument against the application of the Statute of Limitations, that this is a case of an express trust, and therefore it is not embraced by the statute. This trust is alleged to have been created by the writing which Beckham executed on the 23d of July, 1854. But we do not assent to any such construction of that writing, nor do we perceive any thing in the conduct of the parties which raises a trust even by implication. As was well said by the district judge, "No trust can arise by implication from the circumstances of the transaction, as the defendants assumed no new obligation, or in any way recognized the rights of the plaintiffs to the fund derived from the sale of the land. The defendants held these funds adversely, as they formerly held the lands. They only agreed that if the plaintiffs could show, in a court of equity, that they were entitled to any relief against the defendants as the former holders of the land, the same relief should be had against them as the holders of the proceeds of the land." It is clear, from all the evidence, that no such relations were created between the parties, by the transactions of 1853 and 1854, as suspended or stopped the running of the Statute of Limitations, and the suit seems to be barred.

But independently of the conclusion reached upon the question of limitation, there is another view which, in our opinion, equally precludes all relief to the complainants. It is not at all satisfactorily shown that F. W. Davie ever delivered as his act and deed the conveyance of Jan. 15, 1833. The presumption is very strong that he did not. It may be inferred that the original purchase from Teague was made in deference to the wishes, or upon the suggestion, of Allen Jones Davie, whose estimate of the value of the gold under Teague's land was so extravagant that he expressed his belief of its sufficiency to pay the debt of England. The intention of F. W. Davie, perhaps, was at some future time, and when his judgment approved that course, to give his brother, who was of a restless,

speculative disposition, an interest in the land. It was, doubtless, in preparation for the execution of that purpose that an original deed was prepared and signed by him, containing the terms, conditions, and trusts described in the bill, and of which the paper produced is satisfactorily shown to be a correct copy. But no witness proves that he ever delivered the original to Allen Jones Davie, or to any member of his immediate family, or to Colonel Jones, the designated trustee. If the deed which C. Jones, Jr., refers to is the same original, certainly his testimony falls far short of proving that it was ever in the possession of Allen Jones Davie. That witness states nothing more than his "impression" that he saw the deed in the possession of Allen Jones Davie while the latter lived in Hillsboro', N. C. But he cannot remember its contents. Nor does he state in what year he saw it, or that he recognized the genuine signature of F. W. Davie to the deed. The original, of which the one filed is a copy, was certainly in the possession of William R. Davie, a son of Allen Jones Davie, some time after the death of F. W. Davie. But where, from whom, or when he obtained it does not appear. It is not proven that he obtained it in the lifetime of F. W. Davie. It is consistent with the proof, and is not a violent presumption, that it was found among the papers of F. W. Davie after his death. There is no competent evidence that any one ever saw it in the hands of Allen Jones Davie, or that F. W. Davie, in his lifetime, in any form, recognized the right of his brother, or of the trustee, Jones, to its possession. Nor is it shown that the alleged trustee was aware, until after the death of F. W. Davie, of the trust intended to be conferred upon him, when the deed should be delivered.

The loose minutes on the trial docket of the case of Allen J. Davie and others against McCulloch furnish no evidence that Allen Jones Davie, during that litigation, had any such deed, or claimed any right under it. The reasonable construction of the order made, in that case, in the year 1840, is that the suit was dismissed because he could not produce any such deed; and if he could not produce it, it must have been because F. W. Davie still had it in his possession, and had not delivered it to his brother. From 1840, down to his leaving for California,

Allen Jones Davie did not seem to have any connection with
the mines, and no one proves any act or assumption of owner
ship, upon his part, during that period.   In view of the great
value which, at one time, he placed upon this property, we
cannot suppose, had the deed been in his custody or under his
control at any time before starting on a perilous overland jour-
ney to California, that he would have left without either putting
it upon record, or asserting his claim to the land in some dis-
tinct form, or protesting against the absolute sale to Beckham
by F. W. Davie.   More than a year before he departed for
California, his brother had sold and conveyed to Beckham, by
deed, promptly placed upon record, the identical interest in the
land which the appellants claim had been, in 1833, effectively
conveyed to their ancestor.   If, when the conveyance to Beck-
ham was made, F. W. Davie had not delivered the signed deed
of 1833, his determination in 1850 not to make such delivery,
but to sell the land to Beckham, cannot be questioned by plain-
tiffs in error.   Allen Jones Davie had not, so far as the record
shows, paid any thing for an interest in the land, either in
money or services.   The copy of the original deed which is
produced recites no consideration except one dollar in hand
paid; and while the record does not furnish an explanation of
his change of purpose, it is clear that F. W. Davie was under no
legal obligation which prevented him, in 1850, from selling the
land, and withholding from his brother the delivery of the deed of
1833.   So far as the record speaks, it appears to be a case of an
unexecuted gift by F. W. Davie to his brother.   His whole con-
duct for many years prior to his death is altogether inconsistent
with the hypothesis that he had at any time, prior to his sale to
Beckham, consummated the gift by delivering the deed to his
brother.   The conclusions we have expressed are much strength-
ened by what occurred after the sale to the Belmont Mining
Company in June, 1853.   In the fall of that year, C. Jones, Sen.,
in conjunction with William R. Davie, a son of Allen Jones
Davie, employed C. Jones, Jr., an attorney and a kinsman of
the latter, to establish the claim of the trustee and the children
of Allen Jones Davie to the land, or to an interest in the pro-
ceeds of its sale.   C. Jones, Jr., admits that he entered diligently
upon the discharge of this duty.   He was cognizant, because

he was present at the execution, of Beckham's agreement of April 28, 1854, whereby it was stipulated that the trustee and *cestui que trust* might assert, through legal proceedings, any claim they had in the proceeds of the sale of the land, and wherein Beckham agreed to appear to any suit in equity instituted for such purpose, waiving all question of jurisdiction. Although Cadwalader Jones, Sen., lived within about sixty miles of the land for many years after the sale of June, 1853, no such proceedings were instituted until this suit was commenced in 1874, twenty-four years after the death of F. W. Davie, and twenty-one years after the sale to the Belmont Mining Company by his grantees, whose deeds were duly recorded. This great lapse of time since the sale of 1853, without an assertion, in some form of legal procedure, of the rights now claimed, is persuasive evidence that the persons who examined into the facts, when they were fresh in the minds of living witnesses, reached the conclusion that the deed of January, 1833, had never been delivered by F. W. Davie, and that therefore neither the trustee nor the children and heirs of Allen Jones Davie acquired any rights thereunder.

Upon the whole case we are satisfied that the decree dismissing the bill was right, and should be affirmed. It is

*So ordered.*