## BROWNE v. NEW YORK LIFE INS. CO.
### No. 9293.

Circuit Court of Appeals, Eighth Circuit.
March 7, 1932.

E. H. Gamble and Allan R. Browne, both of Kansas City, Mo., for appellant.

George J. Mersereau, Richard S. Righter, Claude A. Ferguson, and Lathrop, Crane, Reynolds, Sawyer & Mersereau, all of Kansas City, Mo., for appellee.

Before KENYON, VAN VALKEN-BURGH, and GARDNER, Circuit Judges.

GARDNER, Circuit Judge.

In this action appellant, as assignee of Carrie Garst, administratrix of the estate of Charles H. Garst, deceased, seeks to recover on a policy of life insurance. The parties will be referred to as they appeared in the lower court.

It is alleged in the petition that the defendant issued and delivered the life insurance policy in question on March 11, 1921, whereby it agreed to pay the executors, administrators, or assigns, of the insured, Charles H. Garst, the amount of $5,000, upon receipt of due proof of his death, and double that amount upon receipt of due proof of his death resulting directly and independently of all other causes from bodily injury effected solely through external, violent, and accidental cause; that on or about May 14, 1921, the insured left his home at Palco, Kan., where he was then residing with his wife and family, with Salina, Kan., as his primary destination, en route to Kansas City, Mo.; that he thereupon disappeared and has not since reappeared, nor has anything since been heard of him; that there was no known cause for his nonreturn, or reason for his disappearance, except his death, which it is alleged occurred May 15, 1921, while the policy was in full force and effect. An assignment of the policy to the plaintiff is alleged, the sufficiency of which is not questioned in this case.

The answer admitted the issuance of the policy, put in issue the other allegations of the petition, and pleaded specially the Kansas statute of limitations, alleging that the policy was a Kansas contract, and hence should be governed by the laws of that state.

At the close of plaintiff's testimony, on motion of defendant, the court directed a

**63**

verdict in favor of the defendant and against the plaintiff, and from the judgment entered on that verdict so directed the plaintiff prosecutes this appeal.

Counsel on either side have elaborately briefed the question of the statute of limitations, but, in our view of the case, there is but one ultimate question for determination, and that is whether or not there was substantial evidence from which the jury might reasonably have determined that the insured died during the life of the policy. The first annual premium only was paid, so that the policy remained in force to and including the 11th day of March, 1922. Attached to the insurance policy is an application signed by the insured, in which he states that he had never suffered from any disease of the brain, nervous system, heart, lungs, stomach, intestines, liver, kidneys, bladder, skin, middle ear, or eye, and various other named diseases. He also states that he had not consulted, nor been treated by, any physician or surgeon within five years immediately prior to the signing of his application.

At the time of the issuance of the insurance policy, and at the time of insured's departure, he was employed in running a Standard Oil station, and at some previous time had been employed in a grain elevator. He was married in 1900, and at the time of his disappearance was living with his wife and family of seven children. On the date of his departure, which was Saturday, he left a letter at the railway station at Paleo, addressed to his son George. The letter bore no date but was received by his wife on May 15, 1921. It was inclosed in a stamped United States envelope, and was addressed to George Garst, at Paleo, but was not postmarked, and had not been mailed. The letter, as well as the address on the envelope, however, was in the handwriting of the insured. This letter reads as follows:

"George, there is nothing that there is no ticket made for. I am going to Salina to see a specialist.

"[Signed] C. H. Garst."

The next that was heard from the insured was a letter mailed at Salina, Kan., May 15, 1921, bearing no date, and reading as follows:

"Dear wife & all I am going to Kansas City to knight. I guess it will mean an operation on my head. O I do dread it. If any thing should hapen Bruce can have the station if he wants it. I don't think the boys can handle it. I have some papers at the bank, insurance.

"By By all

"[Signed] C. H. Garst.

"I will try and write when I get down there."

He had not told his wife that he was going away, and the first she learned of it was through the letters, and the letter of May 15, 1921, was the last word she has ever received from him. On receipt of the Salina letter on May 16, 1921, she went to Kansas City, Mo., and there inquired for her husband at different hospitals, and enlisted the aid of the Kansas City police. Finding no trace of her husband, she went to Salina, Kan., and made inquiry at the hospital there and at nearby rooming places, and enlisted the aid of the Salina chief of police. She notified and made inquiry of all his immediate relatives, and had postcards printed containing a picture of her husband and describing him, and mailed these to a list of sheriffs, whose names she had secured from the Standard Oil Company. She made further inquiry and search at various points in Kansas during the month of May, 1921, but discovered no clue as to his whereabouts. Three years subsequent to insured's disappearance, Mrs. Garst heard that a man named Willie Bissell, living at Loveland, Colo., claimed to have seen her husband there. She immediately went to Loveland, and there met Bissell. She remained in Loveland with the Bissell family for two weeks, enlisted the aid of the Loveland police, and visited various industrial establishments, but could learn nothing regarding her husband's whereabouts. Prior to his departure, his wife observed that he complained of his eyes, and at times was seemingly blind.

Plaintiff relies upon the presumption of death arising from a continuous unexplained absence for a period of seven years. The law presumes that a person shown to be alive at a given time remains alive until the contrary is shown by proof, or, in the absence of proof, until a different presumption arises. At the close of a continuous unexplained absence from his last or usual place of residence for a period of seven years, without having been heard of during such time, the presumption of continuance of life is overcome, and a presumption of death arises. Greenwood v. Frick (C. C. A.) 233 F. 629; Haddock v. Meagher, 180 Iowa, 264, 163 N. W. 417. This presump-

tion is not one of law, but is a mixed presumption of law and fact which may be rebutted, and, in fact, does not arise if the circumstances are such as to account for the absence of the person without assuming his death. Davie v. Briggs, 97 U. S. 628, 634, 24 L. Ed. 1086; Duff v. Duff, 156 Mo. App. 247, 137 S. W. 909.

The evidence in the instant case is clearly sufficient to give rise to the presumption of death of the insured. To entitle plaintiff to recover, however, it was incumbent upon him to prove that death occurred during the life of the policy, and he has alleged that it occurred on or about the 15th of May, 1921. The presumption is not a presumption of the time of death. That must be determined by the facts and circumstances in the case. Death might be proven by circumstantial evidence, as any other fact, but the party alleging death before the expiration of seven years must prove such facts and circumstances connected with the absence of the person as, when submitted to the test of reason and experience, would warrant a reasonable conclusion of death within a shorter period. As said by Justice Harlan in Davie v. Briggs, supra: "If it appears in evidence that the absent person, within the seven years, encountered some specific peril, or within that period came within the range of some impending or immediate danger, which might reasonably be expected to destroy life, the court or jury may infer that life ceased before the expiration of the seven years."

This court, in Northwestern Mutual Life Insurance Co. v. Stevens, 71 F. 258, 261, in an opinion by the late Judge Sanborn, after referring to the established presumption of death, upon the disappearance of an individual under ordinary circumstances, from whom his relatives and acquaintances had not afterward heard during a continuous period of seven years after his disappearance, said that: "* * * The fact of continued life or previous death at the important date should be determined by the jury if there is sufficient evidence in the case to warrant a finding that the established presumption has been varied, and by the court if there is no such evidence."

Again this court, in Folk v. United States, 233 F. 177, 189, said: "* * * In the absence of any direct evidence before the Commission that he had died, or that he had been in such a dangerous situation that men of reasonable prudence would infer that he had died, prior to April 1, 1899, the conclusive legal presumption was that he continued to live for at least seven years after the making of the Creek roll in 1895, and hence that he was living on April 1, 1899. In the absence of proof of earlier death, or of evidence of unusual danger of such earlier death, the legal presumption is that a live person continues to live for at least seven years."

See, also, Continental Life Ins. Co. v. Searing (C. C. A.) 240 F. 653; United States v. Robertson (C. C. A.) 44 F.(2d) 317; Fidelity Mutual Life Ass'n v. Mettler, 185 U. S. 308, 22 S. Ct. 662, 46 L. Ed. 922.

In the final analysis, plaintiff is not materially aided by the presumption of death. Independent of that presumption, it was incumbent upon him to prove that the insured died prior to March 11, 1922. Insured was a man, according to his own statements contained in the application for insurance, of excellent health, and the only evidence showing any possible change in that condition was the evidence to the effect that he was suffering from some eye trouble or defect. He departed from home, leaving word that he was going to Salina to see a specialist. This, however, he did not do. The next word from him was that he was going to Kansas City, and in that communication he said, "I guess it will mean an operation on my head." The hospitals in Kansas City and at Salina were visited, and there is nothing from which the court or a jury could infer that he had died on the operating table. There was no evidence of any accident, or that he met with any violence en route to Salina or Kansas City; no dead body seems to have been found; there was no newspaper record of any casualty; and apparently no knowledge of anything of the sort reached the police department of either of these cities.

The facts and circumstances fall far short of that proof which would lead unprejudiced minds, exercising their best judgment, to conclude that the insured died on May 15, 1921, or at any other particular time during the life of the policy. The jury could not, except by guess or surmise, have determined that insured's death occurred during the life of the policy, and hence it was the duty of the court to direct a verdict for the defendant. The judgment appealed from is therefore affirmed.