## JONES v INDUST COMM

Ohio Appeals, 2nd Dist, Franklin Co

No 3006.   Decided June 16, 1939

Vorys, Sater, Seymour & Pease, Columbus, for Plaintiff-Appellee.

Ralph J. Bartlett, Pros., Atty., Columbus; David B. Sharp, Asst. Pros. Atty., Columbus; Edmund B. Paxton, Asst. Pros. Atty., Columbus, for Defendant-Appellant.

**OPINION**

By BARNES, J.

The above-entitled cause is now being determined as an error proceeding by reason of defendant's appeal on questions of law from the judgment of the Court of Common Pleas of Franklin County, Ohio.

The plaintiff's decedent, William Jones, on and for a long time prior to January 15, 1937, was an employee of the Perfecto Cigar Company, located in the City of Columbus, Ohio. The Perfecto Cigar Company at all times herein mentioned was an employer, employing more than three persons, was amenable to the Workmen's Compensation Act, and was a contributor to the Workmen's Compensation Fund.

The decedent, William Jones, was employed as a truck driver for the

Perfecto Cigar Company, his duties being to deliver kegs of beer from his employer to various customers in the city.

On the 15th day of January, 1937, while so employed and during the course of his employment, the decedent sustained a severe accidental injury in the following manner, to-wit:

The decedent and his helper had gone to the plant of the City Ice and Fuel Company to load his truck with kegs of beer which were stored at the above-named plant. While at said plant preparatory to receiving his load, the decedent noticed that the tail light on the truck he was driving was broken and looked as though it was liable to fall off. The decedent got under the truck in an attempt to repair the light. While he was thus under the truck working on the tail light, for some unexplained reason the steel tail gate of the truck came loose and dropped down, striking the decedent a severe blow on the head. He was not knocked unconscious, but was severely injured, the effect of such injury being noticeable during the entire day. His helper on the truck and others who came in contact with him during the day were impressed by the marked peculiarity of his actions. The decedent was a young married man of unusually strong physical development. So far as known he had never previously had any serious sickness. The nature, extent and effect of this injury may quickly be set forth in the hypothetical questions that were propounded to the physicians being called as expert witnesses. The record supports in detail each and every fact that is set out in the hypothetical question:

"Doctor, I want you to assume that a man who was in good health, who worked regularly six days a week, doing strenuous physical labor, living with his wife and child on good terms, steady in his habits, friendly to his fellows and customers, of a jovial disposition, that about 9:30 one morning he was struck on the back of the head, in the right occipital region, by the steel end gate of a truck. and that immediately after the blow a swelling arose on the back of his head and he showed signs of pain in his head; and after that accident he held his head to one side, and sometimes walked with his head on one side, became dizzy when in a warm room, staggered in his gait and once almost staggered in front of a passing automobile; was curt with his customers, silent with his friends, became confused in the location of familiar streets, once got down from his truck, put down the end gate to unload a barrel, then put it up without unloading the barrel; that he drove unusually slow; that he ate hardly anything at meal times; that when he came home that night he staggered in his gait, he drug his feet; he exclaimed about a pain in his head, his eyes were stary, he talked in a confused manner, and he talked without directing his conversation toward any one; he asked his wife to drive the truck when he knew she could not drive, and never had, and after running into an abutment with his truck, left the truck standing blocking the street and went home; that he gave no explanation to his wife what happened; that he fell when entering home; that he went out with his wife and immediately came in and asked where she was; that he borrowed fifty cents from his brother-in-law and bought a package of cigarets and did not wait for the change; made statements that he was going to Kenton; that he was going to Newark, and that he was going to his mother's without giving any reasons; that his eyes were staring, still staggered in his walk; assuming these facts, Doctor, and that this happened all on the same day he received this blow on the head, in your opinion was there a connection between the blow on the head and the unusual behavior of the individual?"

The above question was pronounced to Dr. William P. Smith, to which he gave the following answer:

"If this man sustained the injury which has just been mentioned, having been struck on the back of his head in the right occipital region, it is perfectly reasonable to contend that symptoms as you have mentioned would be the result of injury to the brain from the blow in the occipital region, and I will explain why: In a case of injury to the posterior part of the skull, the real injury is not produced at the point as much as it is usually forward or in the basal portion of the frontal region and temporal region; in other words the force is transmitted so that we get a condition known as contre-coup, effect on the brain; Now in affecting the brain anteriorly or the frontal lobes, the part of the brain that has to do with reasoning, with figuring, the expressions of conversations he would use and by affecting the temporal lobes it would disturb or affect his conversation, cause the interruption of word sounds or the hearing centers located in temporal lobes; the dizziness accounted for or mentioned would be due to a disturbance in the region of the cerebellum or proximo to the point of injury, as this is the center which permits coordination of the motor senses of the body."

We also present the further historical facts:

He left his home at 215 West Goodale Street, between 9:15 and 9:30 P. M., on this evening of January 15 and was never again seen alive. On February 25 of the same year, his body was found floating in the Scioto River at or near a point where Town Street Bridge spans the river. This was a distance of approximately a mile and a half from his home.

Following decedent's disappearance on the night of January 15, a search was immediately started and inquiry was made of relatives in Kenton and also Newark, where he had casually mentioned he might go, but he had not been seen in either city.

Inquiry was also made at the home of his mother, but he had not been there. It was shown in the evidence that in going to his mother's home, he usually crossed a railroad bridge which spans the river.

On March 25, 1937, plaintiff filed with The Industrial Commission an application for death award, claiming that her husband's death was the result of an accident sustained January 15 in the course of his employment. On September 3, 1937, the claim was disallowed in the following words:

"That death claim is disallowed for the reason that proof of record does not show that decedent's death was a result of the injury sustained in the course of and arising out of his employment."

Plaintiff filed her application for rehearing within statutory time and testimony was thereafter taken before the referee. The claim was disallowed on rehearing and subsequently within the time provided by law, plaintiff filed her appeal in the Franklin County Court of Common Pleas. A trial was had, resulting in a verdict and judgment for the plaintiff, and from that judgment defendant prosecutes this appeal.

Appellant in its assignment of errors sets out eight separately numbered specifications of error. These specifications may be properly grouped under the following headings:

"1. Has plaintiff produced evidence from which reasonable minds might be permitted to find that William H. Jones died as the result of an injury received in the course of his employment?

"2. Did the charge of the court contain error prejudicial to the defendant?

"3. Whether or not the court improperly refused to submit to the jury certain interrogatories.

"4. Whether or not the admission of certain evidence over the objection of the defendant, constitutes error prejudicial to the defendant."

We will consider the claimed errors in the above order.

Following the removal of William H. Jones' body from the Scioto River, on February 25, he was wearing the same clothes that he had on when he left his home on the evening of January 15. The watch which he carried on his person was discovered to have stopped at 10:17. An autopsy performed upon the body revealed that death was caused by drowning. The coroner testified that the body had been in the water at least two weeks and could have been as much as six weeks. The autopsy showed that there was a wound on the right rear portion of the head of the deceased, which extended through the entire thickness of his scalp into the periosteum of the cranium. Upon opening the skull during the autopsy, it was found that there was a diffused superficial port wine staining of the pia of the cerebral hemispheres and a congestion of the cut surface of the cerebral hemispheres. There was also medical testimony to the effect that the condition found on the head and in the brain were the result of a severe blow to the rear portion of the head and the blow was sustained before death; that the condition of the brain resulting from the blow was sufficient to cause a disturbance of mental and motor conditions; that the autopsy findings indicated conclusively an injury to the brain and it was the opinion of both doctors called as experts that the unusual actions of the deceased on January 15, after he was struck on the head, including his lack of balance, incoherence and confusion were the result of the blow on the head, and that the deceased throughout the day was suffering from an impairment of his mental and motor coordination as the result of the blow.

One of the medical experts called was Dr. Harding, who testified that decedent's confused mental state and lack of muscular control could be likened unto a prize fighter who has received a very severe blow and for a time is partially out on his feet.

Counsel for both appellant and appellee agree that no precedent can be found in Ohio decisions under the identical facts of this case.

Counsel for appellee cite numerous cases, mostly from other jurisdictions, but some Ohio cases, which they claim are supporting by analogy.

Counsel for appellant review these cases and strenuously urge that they are to be distinguished. Counsel for appellant stated his conception of the controlling law as follows:

"If the decedent fell into the water and if he fell in there because he was suffering from an injury which made it impossible for him to have control of his body, then the plaintiff would be entitled to participate in the Workmen's Compensation Fund. If, on the other hand, the decedent voluntarily entered the Scioto River, then the plaintiff would not be entitled to share in the Workmen's Compensation Fund, unless it was further shown that the decedent was so deranged mentally that he could not form an intention to take his life. If, on the other hand, the decedent was thrown into the water or knocked into the water by some person or persons unknown, then the plaintiff would not under any circumstances be entitled to share in the Workmen' Compensation Fund."

In addition the following principle of law seems to be conceded by all parties:

"Where a person was last seen in a state of imminent peril that might propably result in his death, and has never been seen or heard from again, and diligent search has been made, the inference of immediate death may justly be drawn."

In the instant case there is no direct testimony as to how, when, where or under what circumstances the decedent got into the Scioto River. The record does show that Mr. Jones was a

good and strong swimmer. Aside from the injuries of his head heretofore referred to, no other abrasions or bruises of moment were found. The fact that his watch stopped at 10:17 is presented as a circumstance indicating the hour that he entered the water.

On the question of presumption, in absence of evidence to the contrary, the law would presume accidental drowning rather than suicide or foul play.

Counsel for appellee makes the following citations:

Fanning v Equitable Life Assurance Society of U. S., (Pa. 1919), 107 Atl. 715:

In this case it appears that plaintiff's insured disappeared in 1908. The policy of insurance upon which the suit was founded, lapsed in 1909. It was necessary for the plaintiff to prove that the insured died before 1909. The insured, Thomas Fanning, resided in Spokane, Washington. In August, 1908, a great forest fire raged in the country near Spokane, in which many lost their lives, some being burned beyond recognition. On a Saturday evening, the insured Fanning, stated that he was going out to fight the forest fire. He was never seen or heard of again. It was held that the state of the record warranted the inference of immediate death. **Travellers' Insurance Company v Rosch, 3 C. C., NS., 156:**

This is an Ohio case, decided in 1902. Plaintiff's insured disappeared from a steamer in mid-ocean. Plaintiff sued Insurance Company upon a policy which provided coverage only in the event of death through external violence and accidental means other than suicide. The record presented nothing more than the fact that the insured was missed in mid-ocean and that a subsequent exhaustive search of the boat revealed no trace of him. The jury found against the Insurance Company and the court sustained the verdict, making the following observation:

"The jury came to the conclusion to which every other man who examined this record would come; that this man died of drowning on the night of June 29 or the morning of June 30, 1897; and that such drowning was the result of an accident to him."

Mallory v Travellers Insurance Company, 47 N. Y., 52:

The beneficiary of deceased insured brought action against the Insurance Company on an accident policy which contained, among others, the following provision:

"Provided always that no claim shall be made under this policy by the said insured in respect to an injury unless the same shall be caused by some outward and visible means of which proof satisfactory to the company shall be furnished."

The insured, who had been staying with his brother at Bridgeport, Connecticut, left the house on Sunday and was last seen alive that day walking towards a railroad bridge over a culvert across a stream; this bridge was used by pedestrians to cross the stream to a considerable extent; the body of the deceased was found in a pond not far from the bridge a few days thereafter. Evidence in the case also discloses that deceased when found had a wound on his head, although it did not appear whether the wound had been received before insured got into the water or was received after he got into the water. The verdict and judgment was against the Insurance Company.

Davie v Briggs, 97 U. S., 628:

Plaintiff's right of action hinged upon whether his decedent's death was set at the time of his disappearance in 1851 or seven years thereafter. Davie was last seen embarking on an expedition fraught with danger of Indian encounters. The court held that Davie could not be presumed to have survived until 1858, the end of the seven year period, but must be considered to have

died at the hands of Indians during the attempted expedition in 1851.

Commonwealth Life Insurance Company v Caudill (Kentucky 1936), 99 S. W. (2d) 745:

The policy sued on lapsed December 24, 1924. The beneficiary sought to prove the death of the insured by accidental means on October 27, 1924. Insured was last seen on October 27, 1924, under the following circumstances: He had been gambling in a building at the edge of the river in Hazard. He reported to his brother that there had been a holdup and his money had been taken. He was disturbed over his money loss and resolved to go back. A witness who accompanied Caudill stated that he was met at the door by big Ed Spicer, who drew a pistol on him. The witness retreated and conveyed information to the deputy sheriff that he thought they were fighting inside. Spicer was subsequently killed. The witness Couch, while on the outside, heard a splashing noise in the river which joined up to the building. The next day search was made, but he was never found. The last that was seen of him was in the gambling place. The jury returned a verdict for the plaintiff, which was reversed by the Court of Appeals for error in admitting certain evidence. However, the court announced the following legal principle:

"Under the state of the record it was the jury's right to determine as to whether the insured died by accidental means on October 27, 1924."

Connecticut Life Insurance Company v Searing, 240 Fed. 653:

Plaintiff sought to collect the proceeds of a life insurance policy taken out by her husband, who disappeared. Suit was brought within one year after disappearance. The deceased was last seen as he entered the surf at Atlantic City on the evening of August 17, 1915. The following is taken from the opinion of the court:

"There was also proof tending to show that Searing had at one time had an accident which left the muscles of his foot so bound that every exertion tended to cramp his lower limbs; that shortly before his disappearance he was examined by a physician and disclosed high blood pressure indicating heart deterioration; that during that day he had complained of abdominal cramp."

At page 657 of the opinion, the court makes the following observation:

"The law has said that after the lapse of seven years a presumption of death arises, but unless seven years have passed there is a presumption of life. This presumption of life can be met and overcome by proof of circumstances of specific peril to which the person disappearing was subjected, and we think there was evidence in this case which, if believed, tended to show such peril."

Brownles v Mutual Benefit Health and Accident Association, 29 Fed., (2d) 71:

Insured and a friend were climbing a mountain on the morning of January 1, 1927. During the morning there was a severe snow storm on the mountain. Insured decided to return down the mountain and left his friend. His friend continued to climb for a while, then gave up and returned. The boys separated at 11 A. M. Insured was never seen again. The next day a search was organized, which continued for a week. There were many canyons, crevices and glaciers near the place where insured left his friend. An unavailing search was conducted for insured's body next spring. Insured was familiar with the mountain. Plaintiff in order to recover had to show that insured had sustained an accident before noon that day and that within three weeks he died as a result of that accident. The court held that the state of the record made a jury question. The following possibilities were recognized by the court:

1. That insured fell and sustained bodily injuries which resulted in his

death. (In which case there can be recovery if death occurred within three weeks after the accident and if the accident occurred before noon January 1, 1927).

2. If insured became lost and having exhausted his food supply starved to death. (In which case there could be no recovery).

3. If insured having become tired and exhausted, stopped to rest and subsequently froze to death. (In which case there could be no recovery).

4. That insured because of physical strain to which he was subjected, died of natural causes.' (In which case there could be no recovery).

The verdict was in favor of the beneficiary and judgment was returned on the verdict.

**Prudential Insurance Company of America v Phillips, 20 Abs 228** (Franklin County).

This is a decision from our court, decided in 1935. Beneficiary was seeking to collect the proceeds of several insurance policies on the life of her husband, who had disappeared on June 27, 1922, some ten years previous. In order for plaintiff to recover it was necessary for her to establish that the date of death preceded the expiration of the policies. From the fact that deceased was not seen after June 27, 1922, and the discovery of certain personal effects in the Scioto River four days after his disappearance, the jury found that insured had died June 27, 1922. A verdict was returned for claimant, and on review was sustained by our court.

**Industrial Commission v Davis, 12 Abs 635.** (Franklin County).

In the above-entitled cause our court determined that plaintiff, in the absence of evidence to the contrary, is entitled to the presumption that decedent did not come to his death by violence practiced upon him by a third party.

**Order of United Commercial Travellers of America v Watkins, 38 Oh Ap 420:**

This case is authority on the principle that in the event of death from unknown causes, a presumption of suicide will not arise in the absence of evidence supporting such a conclusion.

From the state of the record in the instant case, we think the jury would be warranted in finding that the decedent was in imminent danger at all times following the injury to his head on the morning of January 15.

That the imminence had not abated when he left his home on the evening and from such imminence the jury would be warranted in determining that his getting into the Scioto River and drowning would be due to the injury which took away his power of mental and physical coordination.

Decedent's condition both physical and mental was his imminent danger. The cases cited and the reasoning therein are by analogy supporting to the judgment in the instant case.

In conclusion, we have no hesitancy in saying that the evidence produced by plaintiff, taken in connection with the permissible presumption would permit the jury to find that William H. Jones died as the result of an injury received in the course of his employment.

The next question raised is whether or not the court erred in his charge to the jury.

The particular part of the charge complained of reads as follows:

"Now the evidence as to the manner and time of death are largely circumstantial, but you are justified in determining the fact as to the death from the circumstances if the facts proven are such as they will reasonably warrant you in finding the ultimate fact as to the manner of death. It is not necessary that it be absolutely proven. There are few things in human experience that can be absolutely and certainly proven to a mathematical certainty. But you will be justified in finding that the death of Mr. Jones was the result of an accident if it is more probable that he came to his death by reason of an accident

than that he came to his death by some other cause. So that having established the fact that the death was due to drowning, the direct result of death would be drowning, the immediate result of drowning. If you find that he received an injury and that injury caused him either to fall into the water or go into the water voluntarily and he drowned as a result thereof, then you are justified in finding that the death was due to the injury."

Complaint is made as to the last paragraph of the above quotation. The remainder of the quotation is merely given so as to render understandable what the court is talking about. The language is unfortunate, but taken in connection with the rest of the charge, we are unable to conclude that the jury would in any sense be misled. The idea that the court was intending to transmit to the jury is apparent, and we think the jury would necessarily so understand.

It was the theory of counsel for plaintiff that decedent probably fell off the railroad bridge when crossing. Counsel on the other side no doubt were urging that there was no evidence supporting the theory that decedent was on the railroad bridge at all, and further that he may have gone into the water in other ways.

The court desiring to impress upon the jury that it made no difference as to the manner or method of the decedent's getting into the water, if his getting into the water and subsequent drowning were due to his injured condition. When the charge is read as a whole, we do not think there is any room for the conclusion that the jury may have been misled. We will therefore say that we find no prejudicial error in the court's charge to the jury.

The third specification of error relates to the court's refusal to submit to the jury certain interrogatories as follows:

"1. Where did the decedent, William Jones, enter the river?

2. How did he get into the river?

(a) By leaping into the river voluntarily?

(b) By falling into the river?

(c) Or was he forced into the river by some one external means?"

It is our conclusion that the trial court did not commit error in refusing to submit the interrogatories to the jury. None of the questions asked for a finding of ultimate or controlling facts, and for that reason the court correctly refused to present them. 39 O. Jur. 1157.

Under the state of the record, the jury could not have answered any of the questions as propounded.

What difference did it make as to the point where William Jones entered the river? The fact that he was found in the river and was drowned and the cause of his death was drowning, warrants the conclusion that he entered the river some place on a previous date. The exact time or place is immaterial.

The permissible presumption under the law supports the finding that his being in the water was occasioned through his physical and mental condition, all brought on by the previous injury.

Referring to the second interrogatory (a) and (b), we can say it would make no difference whether he leaped into the river or fell into the river. Under the state of the record the jury could not say, and further it is not necessary that they so say. The jury could properly have the mental attitude and say they did not know whether he leaped into the river, or fell into the river, but by indulging the permissible presumption they would arrive at the conclusion that his drowning was due to his mental and physical condition brought on through the injury.

The same observation may be made as to second interrogatory (c), with this additional observation: Where a person is found dead and with no evidence whatever as to the cause of death, a

presumption will arise that death arose from natural causes rather than through foul play. Likewise, where there is evidence of death through drowning, a presumption of accidental drowning will arise in preference to suicide or foul play. Of course, if there are certain surrounding circumstances supporting either theory, such circumstances may overcome the presumption.

In the instant case the surrounding circumstances fail to support or even hint at the theory of suicide or foul play.

In addition to the presumptions which would arise under the law, the surrounding circumstances in the instant case support the inference of accidental drowning.

We find no error in the court's refusal to submit the interrogatories to the jury.

The fourth specification of error relates to the admission of certain testimony. This ground of error is referred to in Appellant's brief, pages 9, 10 and 11. The witness being interrogated was Dr. William P. Smith, one of the expert medical witnesses. The particular evidence complained of appears on pages 56, 57 and 59 of the bill of exceptions. The first objection to the evidence appears at page 56, and is as follows:

"Q. Doctor, assuming the same facts, if the individual did other unreasonable, foolish or dangerous things, contrary to his usual custom, in your opinion, what relation was there between these unreasonable, foolish or dangerous acts and the blow upon the head?"

The answer of the witness is as follows:

"A. Well, the things a patient might do would be variable; he might do things, things at a certain time and under certain conditions do certain other things, so the things he would do would be variable, depending upon the circumstances, surroundings, and so forth."

However objectionable the question might be, it is at once manifest from the answer that no prejudicial error could arise. In view of the previous hypothetical questions that were asked this witness we do not mean to say that the question as propounded was subject to objection, but even if the question was improper, it produced no objectionable substance in the answer.

The next question objected to reads as follows:

"Q. If the individual did other unreasonable and other unusual things."

And the answer as follows:

"A. That is what I am explaining; I do not know what he did but he could do those."

The observations as to the first question and answer apply here.

Objection is also made to the next question:

"Q. What would you say as to the cause of these other unusual things, not knowing what they were, but if he did some, what would you say as to the cause?"

The answer:

"A. The cause of those things might be dependent upon his surroundings or the influence of things in his environment, or there may also be a difference in the effect on that brain after some hours as compared with the beginning of the injury, because of the fact it is now always there—a cessation of an edema in the brain that might affect other parts and manifest itself in other parts of the brain."

The next question:
"Q. Would these subsequent actions be related to the blow on the head, in your opinion?
A. I would say yes."

Then again on page 58:

"Q. Doctor, you stated that in your opinion the unusual actions of the man would be the natural results of the blow on the head but what, in your opinion, is important, what significant facts among these facts found were those which lead you to that conclusion?

A. Well, the thing that leads me to that conclusion that you presented, a man here that has sustained an injury and gave a man living a perfectly normal life and following injury you present a man acting peculiarly and manifesting things that are abnormal to him in his actions, both physical and mental, his incoordination, his ataxia or shuffling feet, his mental disturbance, doing things or repeating or doing things over and over, not knowing why he is doing things, showing his mental disturbance and no coordination in his mental faculties and on a chain of evidence, makes you think there is a chain of evidence or otherwise the man would not change and do things you outlined and with those symptoms you mention we know following a head injury these symptoms follow and these symptoms occur."

And again on page 59 the following question:

"Q. Are these symptoms described here similar in such cases?
A. Yes, they are."

We find nothing prejudicial in the above questions and answers.

A reading of the record will disclose that prior to the questions and answers above quoted, this witness was inquired of and hypothetical questions presented which contained very full detailed information as to the unusual, dangerous and foolish acts of the decedent following his accident.

The judgment of the trial court will be affirmed and costs adjudged against appellants.

HORNBECK, PJ. & GEIGER, J, concur.